UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| CALMER COTTIER,<br><br>               Movant,<br><br>     vs.<br><br>UNITED STATES OF AMERICA,<br><br>              Respondent. | 5:20-CV-05071-KES<br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

This matter is before the court on the motion of Calmer Cottier, through his attorney Ellery Grey, to vacate, correct, or set aside his sentence pursuant to 28 U.S.C. § 2255. See Docket No. 1.[1] Respondent the United States ("government") previously filed to dismiss Mr. Cottier's motion without holding an evidentiary hearing. See Docket No. 24. All but one claim was dismissed. Docket No. 35. This matter was referred to this magistrate judge for the holding of an evidentiary hearing and recommending of a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1.A.2.b on the one remaining claim.

---

[1] Documents cited from this civil habeas file will be cited using the court's assigned docket number. Documents from Mr. Cottier's underlying criminal case, United States v. Cottier, 5:15-CR-50151-JLV-4 (D.S.D.), will be cited using the court's assigned docket number preceded by "CR."

## FACTS

### A.    Proceedings Before the District Court

An evidentiary hearing was held April 24, 2023, at which Mr. Cottier and his former attorney testified at length.  In addition, the court has taken judicial notice of Mr. Cottier's underlying criminal case and appeal.  The following findings of fact are made from that body of evidence.

### 1.    Indictment and Early Discussions

Mr. Cottier was indicted along with multiple co-defendants and charged with second degree murder and aiding and abetting each other in committing second degree murder in connection with the death of Ferris Brings Plenty on the Pine Ridge Indian Reservation on July 12, 2025.  CR Docket Nos. 1 & 2. Attorney Nathaniel Nelson was appointed to represent Mr. Cottier at his December 23, 2015, initial appearance.

Mr. Nelson graduated from the University of South Dakota Knutson School of Law in 2013 and, at the time of his representation of Mr. Cottier, was an associate lawyer at the Rensch Law Firm, working for Tim Rensch.  Docket No. 44 at p. 10 (Transcript of Evidentiary Hearing).  He also obtained a master's degree in public administration from USD at the same time.  Id.

At the time, Mr. Nelson did mostly criminal defense work and was on the Criminal Justice Act panel for court appointments in federal court.  Id. at p. 11.  When he was appointed to represent Mr. Cottier, Mr. Nelson had had one or maybe two trials.  Id. at p. 12.  One trial was a misdemeanor DUI trial in state court.  Id.  Mr. Nelson also assisted Mr. Rensch with his cases.  Id.

2

Mr. Nelson second-chaired a rape trial that Mr. Rensch tried in state court before being appointed to represent Mr. Cottier.  Id. at p. 13.  Prior to representing Mr. Cottier, Mr. Nelson had prepared cases for trial including preparing jury instructions for trial approximately three or four times.  Id. at p. 14.  In federal court, prior to being appointed to represent Mr. Cottier, Mr. Nelson had represented defendants charged with drug conspiracies and two child abuse cases.  Id. at p. 16.

After receiving discovery in Mr. Cottier's case, Mr. Nelson learned the victim who had died was Ferris Brings Plenty, and that weapons such as a machete, a rake handle, and a cinder block were alleged to have been used in the commission of the crime.  Id. at pp. 17-18.  Mr. Nelson downloaded and printed all the pleadings in Mr. Cottier's codefendants' cases.  Id. at p. 18.  Mr. Nelson applied for and received permission and funds to hire a private investigator.  Id.  During his representation of Mr. Cottier, Mr. Nelson met with his client several times, including driving to Pierre to meet with him.  Id. at pp. 20, 29.  By the time Mr. Cottier was indicted, he had given four separate statements to the Federal Bureau of Investigation.  Docket No. 43 at p. 87.  This was at a time *before* he was represented by Mr. Nelson.

One of the factual matters that was an issue throughout the case was that the government accused Mr. Cottier of throwing a cinder block at Ferris Brings Plenty and Mr. Cottier denied ever having done so.  Id. at p. 35.  In the government's discovery there had been a photo of a brick found at the crime scene.  Id. at pp. 35-36.  The discovery also indicated that several witnesses

told government investigators that Mr. Cottier threw the brick at Ferris.  Id. at p. 36.  Mr. Cottier was adamant that he had not thrown a cinder block.  Id. at pp. 125-26.  He explained to Mr. Nelson that Terry Goings, a codefendant, and Mr. Cottier had never really gotten along.  Mr. Cottier explained that Goings was affiliated with a different gang, that Goings wielded a weapon in the assault, and that Mr. Cottier believed Goings made up the lie about Mr. Cottier throwing a brick in order to involve Mr. Cottier more deeply in the case.  Id. at pp. 125-26.

On December 31, 2015, the government sent Mr. Nelson a letter confirming that Mr. Cottier had agreed to proffer with the government concerning the events surrounding Ferris Brings Plenty's death.  Docket No. 42 at pp. 1-3 (Ex. No. 1).  A memo to the file created by Mr. Nelson indicated that government counsel stated Mr. Cottier gave the FBI four statements and each was different.  Id.  Government counsel told Mr. Nelson that two of the codefendants had already given proffers.  The government believed Mr. Cottier was the one responsible for amping everyone up and that he hit Mr. Brings Plenty with his fists, and kicked him while he was down.  Id.

The proffer never took place.  Instead, Mr. Nelson communicated to the government through email that Mr. Cottier would not proffer unless it involved an offer from the government to allow him to plead guilty to a reduced charge.  Id. at p. 7 (Ex. No. 3).  Mr. Nelson stated that Mr. Cottier asserted "he is in no way guilty for the death of Mr. Brings Plenty and he will not entertain pleading guilty to a charge that he did not commit."  Id.  A memo Mr. Nelson wrote to his

file contemporaneously (dated January 27, 2016), indicated that Mr. Cottier had refused to proffer because the government would not offer him a plea deal to any charge except second degree murder.  Docket No. 43 at p. 89 (Ex. No. 104).  The file memo indicated that Mr. Cottier was adamant that he would not plead guilty to murder.  Id.

The government was equally forceful in insisting that any agreement would require Mr. Cottier to plead guilty to second degree murder.  See Ex. 3, Docket No. 42 at pp. 7-8.  Emails exchanged between two government lawyers indicated that perhaps they should send Mr. Nelson a legal definition of "aiding and abetting."  Id.

The day before Mr. Nelson sent this email to government counsel, he had conducted legal research into the concept of aiding and abetting.  Docket No. 43 at pp. 1-86; Docket No. 44 at p. 113.  Among the cases counsel read was Rosemond v. United States, 572 U.S. 65 (2014).  Counsel highlighted the following passages from the Rosemond opinion:

> As previously explained, a person aids and abets a crime when (in addition to taking the requisite act) he intends to facilitate that offense's commission.  An intent to advance some different or lesser offense is not, or at least not usually, sufficient:  Instead, the intent must go to the specific and entire crime charged . . . To aid and abet a crime, a defendant must not just "in some sort associate himself with the venture," but also "participate in it as in something that he wishes to bring about" and "seek by his action to make it succeed," . . .

Rosemond, 134 S. Ct. 1240, 1248.[2]  Mr. Nelson highlighted the language in the

Rosemond opinion holding that mere presence at an event is not enough to

show culpability for aiding and abetting.  Docket No. 44 at pp. 112-13.

Mr. Nelson testified that he was confused about aiding and abetting law

at first, but after he talked with government counsel and did his own research,

he felt comfortable that he understood aiding and abetting law.  Id. at 114.

Other cases downloaded and read by counsel as evidenced by his file

included:  United States v. Hill, 464 F.2d 1287 (8th Cir. 1972) (holding that

aiding and abetting requires specific intent or purposive attitude; "mere

presence at the scene is insufficient, it must be accompanied by a culpable

purpose."); United States v. Bauer, 173 F.3d 862 (8th Cir. 1999) (unpub'd)

(holding that aiding and abetting did not require a showing of specific intent,

but rather that the defendant had "the specific intent to facilitate the

commission of a crime by another."); Harris News Agency, Inc. v. Bowers, 809

F.3d 411 (8th Cir. 2015) (firearms store owner willfully allowed a known felon

to enter their employ and sell guns so as to uphold an administrative finding of

aiding and abetting); United States v. Stangeland, No. 08-CR-4043-LRR, 2009

WL 1371206 (N.D. Iowa May 13, 2009) (holding that aiding and abetting

requires proof that the defendant shared the principal's criminal intent and

that the defendant knew, or recklessly disregarded the fact that a crime was

---

[2] At the time counsel downloaded the Rosemond opinion and read it in January
2015, the United States Reports citation was not yet available.  Only the
Supreme Court Reports and the Lawyer's Edition Reports citations were
available.  The court cites to the S. Ct. citations because that is how they
appear on Ex. No. 43.

being committed or was about to be committed); United States v. Sayetsitty, 107 F.3d 1405 (9th Cir. 1997) (although second degree murder was not a specific intent crime, aiding and abetting second degree murder *was* a specific intent crime requiring the jury to be instructed that the accused had the specific intent to facilitate the commission of a crime by another, that the accused had the requisite intent of the underlying substantive offense, and that the accused assisted or participated in the commission of the underlying substantive offense); United States v. Jackson, 213 F.3d 1269 (10th Cir. 2000); United States v. Roan Eagle, 867 F.2d 436 (8th Cir. 1989) (rejecting defendant's argument that specific intent was required to demonstrate aiding and abetting; rather, it "is linked to the underlying offense and shares the requisite intent of that offense."); United States v. Kelton, 446 F.2d 669 (8th Cir. 1971); Faul v. Wilson, 15-CV-1541 (PJS/TNL), 2016 WL 54195 (D. Minn. Jan. 5, 2016) (holding that Rosemond did not create new law as to a prisoner who was collaterally attacking his conviction for aiding and abetting second degree murder and that the facts supported his conviction because he carried a rifle and fired at least six shots during the event).

Mr. Nelson testified that, after doing the above research, his "understanding is that a person aids and abets a crime when in addition to taking the requsite acts he intends to facilitate that offense—that offense's commission. And an intent—this is directly from my research from Rosemond, 'An intent to advance some different or lesser offense is not, or at least not usually, sufficient. Instead, intent must go to the specific and entire crime

charged'—so here, to the full scope." Id. at pp. 143-44.  Mr. Nelson testified

that if the jury believed Mr. Cottier "did not go down there and—my

understanding is that if he did not go down there and—with the intent to

facilitate the offense, the assault that they had intended, that he would not be

guilty of aiding and abetting". Id. at p. 144.

 Mr. Nelson could not give a specific date, but he testified he did discuss

the law of aiding and abetting with Mr. Cottier and explained to him that

whether he did or did not throw a cinder block was not determinative of his

guilt. Id. at pp. 99, 139-40.  Based on the date Mr. Nelson did his legal

research (January 21, 2016), he testified he believed his conversation with

Mr. Cottier about aiding and abetting law took place on or before his file memo

dated January 27, 2016, in which he recorded Mr. Cottier's refusal to plead

guilty to any murder charge.  Id. at p. 119.  Mr. Nelson knew that he had

explained to Mr. Cottier that he could be found guilty of second degree murder

even if the jury believed he did not throw a cinder block at Ferris.  Id.

Mr. Nelson understood at the time that whether Mr. Cottier had the intent to

engage in the fight personally was not one of the elements of aiding and

abetting second degree murder.  Id. at p. 105.

 Mr. Cottier testified he could not remember Mr. Nelson talking to him

about the law of aiding and abetting and stated, "I don't really recall much of

our conversation." Id. at p. 151.  Mr. Cottier reviewed Ex. No. 107 and could

not testify to the date he wrote the undated document.  Id. at p. 152.  Ex. 107

is entitled "Calmer Cottier aiding and abetting!"  Docket No. 43 at p. 93.

Mr. Cottier had written three bullet points with reference to count 1 of the indictment charging him with aiding and abetting second degree murder:

> • I did not know a murder was going to occur but I was all for the fight—we all wanted to watch it
>
> • I had no intentions of murder or assaulting Ferris Brings Plenty!
>
> • I had reacted in a self-defense manner, did not persue [sic] in a chase—I never used malice

Id.  Although Mr. Cottier could not remember when he wrote Ex. 107, he did agree that he probably wrote it some time after he and Mr. Nelson discussed aiding and abetting.  Id. at p. 161.

Mr. Cottier testified that after that meeting with Mr. Nelson where they discussed aiding and abetting law, he "went directly back and used the law library to do some studying on my own along with another individual who has been down on murder before and got out and was in on a probation violation. And it was like using what he called two powers combined, you know, you got an attorney, then you got a legal beagle on the inside."  Id.  Mr. Cottier testified "[l]ike you got an attorney and you got people in the inside that study this law thing.  And if you put them both together, you know, it was something that he told me to discuss with my attorney, like, ask these questions, you know, and see where—see where his mind is at."  Id.

Mr. Cottier testified that his understanding was that in order to be convicted of aiding and abetting second degree murder the government would have to show he knew a murder was going to be committed that night or that he had the intent to assault the victim.  Id. at p. 152.  He could not recall,

however, where he had obtained this understanding.  Id.  Mr. Cottier could not recall what he and Mr. Nelson did or did not discuss about aiding and abetting.  Id.

After Mr. Cottier refused to proffer, a superseding indictment was filed that added a charge against Mr. Cottier and his codefendants for conspiracy to commit assault.  CR Docket No. 62.  The superseding indictment also charged Mr. Cottier alone with solicitation to commit second degree murder.  Id.

### 2.    First Formal Plea Offer—March 2016

On March 16, 2016, government counsel communicated a plea offer to Mr. Cottier.  Docket No. 42 at p. 9.  That plea offer would have required Mr. Cottier to plead guilty to second degree murder in return for the government's dismissal of all other charges.  Id. at p. 11, ¶ C (Ex. No. 4. at p. 2, ¶ C).  The offer included a promise by the government that Mr. Cottier should receive a total of three points downward adjustment to his United States Sentencing Guidelines ("USSG") base offense level for accepting responsibility. Id. at pp. 3-4, ¶¶ E & F (Ex. No. 4. at pp. 3-4, ¶¶ E & F).  The government also agreed to recommend a sentence within the USSG range.  Id. at p. 13, ¶ G (Ex. No. 4. at p. 4, ¶ G).  The offer did not require Mr. Cottier to cooperate with the government.  Id. at p. 23 (Ex. No. 4 at p. 14).

This plea offer would have required Mr. Cottier to admit the following facts, among others:  that he exchanged derogatory gang words with Aaron Little Bear; that he told Terry Goings that Aaron was calling him out to fight; that he encouraged his group to fight Aaron; that Terry displayed a machete to

10

Mr. Cottier and the others and suggested using it on Aaron; that Mr. Cottier discussed with others a surprise attack on Aaron and his associates as well as discussed weapons; that on the way to fight Aaron a member of the group picked up a stick; that upon arrival of defendant's group they found Aaron Little Bear was absent but that Ferris Brings Plenty was sleeping in a tent; that as Ferris emerged from the tent Mr. Cottier threw a cinder block at Ferris, striking him in the face and causing him to stumble; that he along with others kicked Ferris in the head and face while he was on the ground; that others beat Ferris with the machete and stick; that the group of attackers, including Mr. Cottier, left Ferris on the ground and fled the scene; and that Ferris Brings Plenty died a short time later from his injuries.  Docket No. 42 at pp. 17-19.

Mr. Nelson conveyed this plea offer to Mr. Cottier, who rejected it. Docket No. 42 at p. 25, Ex. No. 5.  Mr. Nelson's note to the file specifically indicated that Mr. Cottier said he was not interested in any offer that required him to plead guilty to second degree murder.  Id.

Mr. Cottier remembered Mr. Nelson presenting him with only two, not three, plea offers from the government.  Docket No. 44 at p. 147.  He testified one was offered to him in January 2016, and the last one was offered in July 2016.  Id. at pp. 149-50.  This testimony is not supported by the record.  There was no plea offer in January 2016, but there was an invitation to proffer. There was a plea offer made in March 2016, but Mr. Cottier did not recall this one.  His recollection that the plea offer made in July 2016 was the last plea offer extended is also in error, as there was a third plea offer made shortly

11

before trial.  In any case, Mr. Cottier's § 2255 motion centers on the July 2016
plea offer and he did testify that he remembered that offer.

### 3.    Pleas of Mr. Cottier's Codefendants in April and June

On April 22, 2016, Steven Steele entered a plea of guilty.  CR Docket
No. 123.  Steele's sworn factual basis statement included statements that
Mr. Cottier encouraged the group to fight.  CR Docket No. 112 at p. 2.  Steele
swore that Mr. Cottier landed the first blow on Ferris by throwing a cinder
block.  Id.  Steele also stated that Mr. Cottier kicked Ferris in the face and head
when Ferris was on the ground.  Id.

On April 29, 2016, Terry Goings III entered a plea of guilty.  CR Docket
No. 134.  His sworn factual basis statement included statements that
Mr. Cottier encouraged the group to fight and that he threw a cinder block at
Ferris' face, landing the first blow.  CR Docket No. 127 at p. 2.  Terry also
swore that Mr. Cottier kicked Ferris in the head and face while he was on the
ground.  Id.

Mr. Cottier's brother, Jerome Warrior, was also charged in connection
with Ferris Brings Plenty's death.  CR Docket No. 1.  On June 2, 2016, he
signed plea agreement documents in which he swore as true the fact that
Mr. Cottier incited the others to fight and that Mr. Cottier landed the first blow
when he threw a cinder block at Ferris' head, causing Ferris to stumble.  CR
Docket No. 156 at pp. 1-2.  Jerome swore that Mr. Cottier kicked Ferris in the
head and face while he was on the ground.  Id.  Jerome also swore that

Mr. Cottier knew Terry and Steve were armed with a machete as the group approached Ferris' location.  Id.

### 4.    Second Formal Plea Offer—July 2016

On July 25, 2016, the government communicated a second plea offer to Mr. Cottier.  Id. at p. 28 (Ex. No. 7).  This offer was similar to the first offer except that, in addition to the other promises made by the government, this time the government also agreed to recommend Mr. Cottier receive a two-level reduction in his base offense level under the USSG for being a minor participant under USSG § 3B1.2(b).  Id. at p. 33 (Ex. No. 7 at p. 5, ¶ H).

The factual basis statement was substantially similar except it recited that Mr. Cottier told Jerome Warrior (not Terry Goings), that Aaron was calling Mr. Cottier out to fight.  Id. at p. 37 (Factual Basis Statement p. 2).

In an email sent the same day as the plea offer, government counsel explained that she had asked her supervisor to approve a four-point reduction in Mr. Cottier's USSG calculation for being a "minimal participant," but that her supervisor would not approve that provision.  Id. at p. 46 (Ex. No. 8 at p. 3).  The best the government could offer was the two-point reduction for "minor participant."  Id.  Government counsel estimated Mr. Cottier's USSG range would be 97-121 months if he were in criminal history category I.  Id.

Mr. Nelson expected to receive a different plea offer from the government and wrote an email stating that.  Id. at p. 45.  Government counsel responded that Mr. Nelson misunderstood or misconstrued what counsel had discussed orally.  Id. at pp. 44-45.  Furthermore, government counsel interpreted the two

13

lawyers' oral discussion to mean that Mr. Cottier would not agree to plead guilty to second degree murder, but might consider manslaughter, which the government was unwilling to offer.  Id.  Around this time, Mr. Cottier (who was detained pretrial), was transferred from the Pennington County Jail to the Hughes County Jail in Pierre, South Dakota.  Id. at p. 45.

Mr. Nelson testified that he met with Mr. Cottier in Pierre on August 18, 2016, to discuss the government's July 2016 plea offer.  See Docket No. 44 at p. 42.  Mr. Nelson did not have a specific recollection of what he and Mr. Cottier discussed when they were considering the government's July 25, 2016, plea offer.  Id. at pp. 93-95.  He testified he would have "certainly discussed" or he "would be very surprised if we did not discuss aiding and abetting" law.  Id. at p. 94.  Mr. Nelson testified they most likely would have discussed Mr. Cottier's liability in light of the four statements he gave law enforcement.  Id.  They would have discussed that Mr. Cottier and some of the other codefendants had agreed to lie to police about the events and made up a story to cover up their involvement.  Id.

In terms of advising Mr. Cottier whether to take the plea offer, Mr. Nelson testified he probably told Mr. Cottier what he typically tells his clients:  "I can't tell you what to do, it is your life.  All I can tell you is what the facts are, what the law is, what likely outcomes will be, but you're the one that has to make that decision [whether to plead guilty]."  See Docket No. 44 at p. 96.  Mr. Nelson testified he "almost never" tells clients "you have to take this or should take this" plea offer.  Id.  "I present it and let them make the decision."

Id. Because this is his usual practice, Mr. Nelson believed this is what he likely told Mr. Cottier. Id. Mr. Nelson could not remember whether he advised Mr. Cottier to take or reject the July 2016 plea offer. Id. at p. 68.

Mr. Nelson added he usually tells clients they know the truth and they are the ones that will have to live with the consequences. Id. at p. 97. If the client is primarily interested in limiting their exposure, then taking a plea offer is usually in their best interests. Id. If the client is adamant about telling their story, getting the truth out and then letting the jury decide, then trial is in their best interests. Id. Mr. Nelson anticipated that he told Mr. Cottier these things. Id. Nevertheless, Mr. Nelson conceded that he may have advised Mr. Cottier to take the July plea offer or not to take it. Id. at p. 97. Mr. Nelson stated that there were many conversation he had with Mr. Cottier that were not memorialized by a document in his file. Id. at pp. 123-24.

Mr. Cottier testified that he remembered Mr. Nelson advising him to reject the government's July 2016 plea offer. Id. at p. 149. Mr. Cottier testified Mr. Nelson advised him he would be "shooting himself in the foot" if he accepted it, and that Mr. Cottier had leverage on the issue of the cinder block, so that gave him the upper hand and the government would have to come down. Id. Mr. Cottier testified that Mr. Nelson advised him the government did not have the actual cinder block, only a photograph of one, and that the photograph without the actual brick could not be used at trial. Id. at p. 150.

After the August 18 meeting, Mr. Cottier indicated he was willing to accept the plea offer if changes could be made to the factual basis statement

including removal of the statement that Mr. Cottier threw a cinder block.  Id. at pp. 42, 99, 126-27.  See also Docket No. 42 at pp. 50-51 (Ex. No. 10a showing changes proposed by Mr. Cottier).  Mr. Cottier admitted he was in the wrong, that he fought Ferris, that he helped get the other codefendants agitated to engage in the fight, that he knew there were weapons, and that he knew it was possible someone could have gotten killed.  Docket No. 44 at p. 42.

On August 19, 2016, Mr. Nelson responded to the plea agreement from the government, stating Mr. Cottier was going to take the offer but wanted a few things changed on the factual basis.  Docket No. 25-1.  Mr. Cottier was adamant that he had not thrown a cinder block at the victim and Mr. Nelson asked if that statement could be removed from the written statement of factual basis.  Id.  Counsel also asked the government to confirm that after all the deductions, Mr. Cottier's USSG total offense level would be at 30.  Id.

On September 13, 2016, Mr. Nelson proposed changes to the factual basis statement accompanying the July plea offer.  Id. at p. 49 (Ex. No. 10a).  Instead of Mr. Cottier exchanging derogatory remarks with Aaron, Mr. Nelson proposed stating that Aaron exchanged derogatory remarks with Mr. Cottier and challenged Mr. Cottier to a fight.  Id. at p. 50.  In place of the statement that Mr. Cottier threw a cinder block, Mr. Nelson wrote that Mr. Cottier and Ferris engaged in a fist fight, which caused Ferris to stumble.  Id. at p. 51.  Mr. Nelson also proposed striking the sentence stating that Mr. Cottier kicked Ferris in the face while he was on the ground.  Id.

In a September 16, 2016, email, government counsel agreed to the first change suggested by Mr. Nelson to the factual basis statement, but refused to delete the statement about the cinder block.  Id. at p. 48 (Ex. No. 10).[3] Government counsel proposed resolving the issue by writing the factual basis statement to set forth what *others said* Mr. Cottier did (i.e. throw a cinder block), rather than asserting that Mr. Cottier in fact threw the cinder block.  Id.

Sometime in September, 2016, either Mr. Cottier or his girlfriend called Mr. Nelson and stated he would not agree to plead guilty.  Id. at p. 95. Mr. Cottier told Mr. Nelson that he already had a murder conviction on his record from when he was a juvenile and he "didn't want another body count on his record."  Id. at p. 100.  He acknowledged his guilt for the death of the individual in his juvenile case, but "he was adamant [Ferris's death] wasn't his fault" and "so even through aiding and abetting law, it was the principal of it and [Mr. Cottier] would not agree to plead guilty to murder because he didn't seem to think it was fair."  Id.

Mr. Cottier had previously spent a substantial amount of time in prison before being charged with Ferris Brings Plenty's death.  Docket No. 44 at p. 132.  He spent a lot ot time talking to Mr. Nelson about prison politics, and specifically the benefits an inmate has "on the yard from going to trial versus pleading because there's always concerns about cooperation and different things like that.  And life tends to be a little bit easier for people who go to trial

---

[3] The email did not mention the third change proposed—deleting the reference to Mr. Cottier kicking Ferris in the face while he was on the ground.  Docket No. 42 at p. 48.

because it's obvious that they didn't cooperate if they went to trial." Id. at

p. 132. This concern was "a big part" of Mr. Cottier's discussions with

Mr. Nelson about pleading guilty. Id.

Mr. Nelson testified another factor that Mr. Cottier considered in deciding

whether to plead guilty was that the most culpable codefendant, the one who

had wielded the machete and mortally wounded Ferris (Steven Steele), had

already been sentenced to 17.5 years' incarceration. Id. Mr. Cottier believed

that it was unlikely that the district judge would sentence Mr. Cottier to a

longer sentence than 17.5 years. Id. at pp. 100-01. Ultimately, Mr. Cottier

expressed to Mr. Nelson that he wanted to go to trial. Id. at pp. 133-34.

Mr. Cottier testified that he ultimately rejected the July 2016 plea offer

after talking to the mother of his children. Id. at p. 154. He then told his

girlfriend to call Mr. Nelson and tell him Mr. Cottier would not plead guilty. Id.

Mr. Cottier testified he relied on the advice of his attorney in making this

decision. Id. at p. 155.

Mr. Cottier agreed that the July 2016 factual basis statement was

problematic for him because it contained the allegation that he threw a cinder

block at Ferris. Id. at p. 156. Mr. Cottier testified that Mr. Nelson told him the

prosecutor would not "come off the cinder block," that it had "to be part of the

story to meet the criteria for the charge." Id. at p. 157. Mr. Cottier claimed

that he was never advised by Mr. Nelson that the prosecutor was willing to

change the language to reflect that *others said* Mr. Cottier threw the block. Id.

Mr. Cottier testified he would have taken the July 2016 plea offer if Mr. Nelson had told him about the change in language in the factual basis statement, and if Mr. Nelson had recommended to Mr. Cottier that he accept the plea offer.  Id. at pp. 157-58, 164-65.  Mr. Cottier acknowledged that Mr. Nelson "maybe somewhere along the line" explained to him the elements of the offense.  Id. at p. 159.  But he denied that Mr. Nelson had told him he could be convicted if he knew the assault of Ferris Brings Plenty was being committed and he joined in with punches and a kick.  Id. at p. 163. Mr. Cottier testified that Mr. Nelson advised him if the jury believed his testimony at trial, he could not be convicted.  Id. at pp. 159-60.  Mr. Cottier testified that Mr. Nelson told him he had a 65-percent chance of being acquitted at trial.  Id. at pp. 152-53.  Mr. Cottier testified that Mr. Nelson's estimate was based on the lack of evidence and all the government witnesses having different stories.  Id. at p. 153.

Even after listening to Mr. Nelson's testimony at the evidentiary hearing, and receiving quite a few letters from Mr. Nelson about it, Mr. Cottier testified he still did not understand the concept of aiding and abetting.  Id. at p. 164-66.

After Mr. Cottier rejected the July 2016 plea offer, Mr. Nelson testified that Mr. Cottier wrote a letter to him which was received September 29, 2016. Id. at p. 119 (referencing Docket No. 43 at p. 92 (Ex. 106)).  In the letter, Mr. Cottier asked Mr. Nelson to find out what the killing blow was and whether this killing blow could be consistent with the weapons used and what the

government's pathologist had opined as to the cause of Ferris Brings Plenty's death.  Id.

Mr. Cottier also wrote a letter or a memo to Mr. Nelson that is undated and to which Mr. Nelson was unable to fix a date.  Id. at pp. 135-36 (referencing Docket No. 43 at p. 93 (Ex. No. 107)).  Mr. Nelson agreed that Mr. Cottier's expressions of his defenses to the indictment in Ex. 107 (previously discussed above) represented a misunderstanding of the law of aiding and abetting on Mr. Cottier's part.  Id. at 136-37.  Mr. Nelson testified it was possible that Mr. Cottier could have obtained his misunderstanding of the law from Mr. Nelson.  Id. at p. 137.  Mr. Nelson agreed it was possible Mr. Cottier rejected the government's July 2016 plea offer based on a misunderstanding of aiding and abetting law as expressed in this undated memo.  Id. at pp. 138-39.  He also agreed that it was possible Mr. Cottier wanted to go to trial based on a misunderstanding of the law.  Id. at p. 139. But Mr. Nelson had a specific recollection of going to see Mr. Cottier at the jail and explaining the law of aiding and abetting to him in great detail.  Id. at pp. 139-40.  He specifically told Mr. Cottier that even without the fact about the cinder block, Mr. Cottier could be found guilty.  Id. at p. 140.  He told Mr. Cottier the jury could find him guilty if it believed he went to the scene with the intent to join in the assault.  Id.  Mr. Nelson testified that Ex. 107 written by Mr. Cottier could have been written at a time prior to when Mr. Nelson explained the law of aiding and abetting to Mr. Cottier.  Id. at p. 141.

After receiving the phone call from Mr. Cottier or his girlfriend rejecting the July 2016 plea offer, Mr. Nelson wrote a memo to his file dated September 22, 2016, indicating that Mr. Cottier refused the plea agreement because he would not agree to plead guilty to murder. Id. at p. 53. Mr. Cottier told Mr. Nelson he would plead guilty to solicitation and assault, but not to conspiracy or murder. Id. He would not plead guilty to any charge with murder in it. Id. Mr. Cottier asked Mr. Nelson to get a pathologist's report on what the killing blow was and to get a second opinion. Id. On November 23, 2016, the government revoked all outstanding plea offers. Id. at p. 54 (Ex. No. 12).

### 5.    Negotiations Before Trial

On May 8, 2017, Mr. Nelson emailed government counsel and informed her that Mr. Cottier would readily plead guilty to an assault charge with a five-year sentence. Docket No. 25-3. In response, the government made another formal plea offer on May 9, 2017. Docket No. 42 at p. 58 (Ex. No. 16). This offer was identical to the offer previously made in March 2016. It contained no concession for Mr. Cottier's being a minor participant in the events. Id. The factual basis statement reiterated the statement that Mr. Cottier had thrown a cinder block at Ferris' head, causing him to stumble. Id. The government rejected Mr. Cottier's offer to plead guilty to assault, stating that the last plea offer made was the government's final offer. Docket No. 42 at p. 57 (Ex. No. 15).

On May 19, 2017, Mr. Nelson again emailed government counsel and reiterated Mr. Cottier's willingness to plead guilty to an assault charge with a

five-year sentence, but that he was "adamant he [was] not talking [sic] a plea

deal to murder because he is innocent of that charge."  Docket No. 25-4.

On June 4, 2017, Mr. Nelson emailed government counsel to notify them

that his investigator had spoken to codefendant Steven Steele who retracted his

assertion in his factual basis statement (Steele had previously pleaded guilty)

to the effect that Mr. Cottier threw a cinder block at Ferris.  Docket No. 42 at

pp. 71-72 (Ex. No. 17).  Mr. Nelson stated Mr. Cottier remained open to a plea

to an assault charge.  Id.  Mr. Nelson testified that his June 4 email to

government counsel was merely adversarial posturing, although it was true

that Steven Steele had disavowed his previous statement about Mr. Cottier

throwing a cinder block.  Docket No. 44 at p. 65.

### 6.    Pretrial Conference—Discussion of Jury Instructions

A pretrial conference was held on May 30, 2017.  CR Docket No. 474.

The court's proposed jury instruction number four,[4] at page seven, was

problematic to the government.  Id. at p. 43.  The government explained the

instruction provided "[m]erely being present at the scene of an event or merely

acting in the same way as others or merely associating with others does not

prove that person has become an aider and abetter."  Id.  The government

explained it believed this was not an accurate statement of the law under

United States v. Roan Eagle.  Id.  Government counsel argued that under Roan

---

[4] The court's proposed jury instructions at issue are docketed at CR Docket
No. 372.

<u>Eagle</u>, if a defendant associates himself with a venture, participated in it, and wished to bring it about, then he is an aider and abetter.  <u>Id.</u> at pp. 43-44.

The government explained it understood Mr. Cottier's theory of defense at trial would be that he did not strike the fatal blow.  <u>Id.</u> at p. 43.  The government believed that the jury instruction would mislead the jury as to the law of aiding and abetting.  <u>Id.</u> at pp. 43-44.  The court suggested eliminating the phrase "or merely acting in the same way as others."  <u>Id.</u> at p. 45.  Both government and defense counsel agreed with that suggestion.  <u>Id.</u> at pp. 44-45.

Government counsel then sought to amend page eight of the court's proposed jury instruction number four.  <u>Id.</u> at pp. 45-46.  The instruction read "to find the defendant guilty of the offense of second degree murder or by aiding and abetting."  <u>Id.</u> at p. 45.  Government counsel requested that the instruction be changed to read "to find the defendant guilty of the offense of second degree murder or aiding and abetting second degree murder. . ."  <u>Id.</u> at pp. 45-46. Mr. Nelson had no objection to this change.  <u>Id.</u> at p. 46.

Mr. Nelson proposed a change to the court's proposed instruction number four as well.  <u>Id.</u> at p. 47.  The instruction provided on page six "knowing that the assault of another individual was being committed."  <u>Id.</u> Mr. Nelson requested that the instruction be amended to read "knowing that the killing of another individual was being committed."  <u>Id.</u>

The court rejected that proposed amendment, explaining that the government only had to prove that Mr. Cottier "set out to assault [the victim] and acted with malice aforethought, for example, wanton and willful disregard

of the risk of life" of the victim and that the victim later died of his injuries.  Id.

at pp. 47-48.  The court noted it was "the assault that resulted in death that is

the offense here."  Id.  The court further noted that malice aforethought "meant

intent at the time of a killing willfully to take the life of a human being or intent

willfully to act in a callous and wanton disregard for the consequences to

human life."  Id. at pp. 48-49.

> Mr. Nelson responded:
>
> So if somebody is going to be found guilty of second degree murder
> through aiding and abetting, I think the language in here shouldn't
> just be assault, I think it should be something more substantial
> that goes to the actual crime that he's alleged to have committed,
> which is, frankly, essentially killing somebody.  So just a brief
> alteration of that word "assault" to "assault with a deadly weapon,"
> possibly, or "assault with malice aforethought," because the way
> this is read, a juror could easily find that because somebody got
> into a fight, a fist fight, that he could be found aiding and abetting
> second degree murder.

Id. at p. 49.

The court asked whether it was Mr. Nelson's position that the

government was required to prove that Mr. Cottier set out to kill the victim.  Id.

at pp. 49-50.  Mr. Nelson responded, "[t]hey have to prove that there was an

assault with a dangerous weapon, or something, to the point that it was

elevated to an aggravated assault with malice aforethought.  They don't have to

prove he was killed, but they have to prove that there was an intent to cause

grievous bodily harm where somebody may die."  Id. at p. 50.

The court agreed the government did have to prove the victim was killed,

but stated the government did not have to prove that the assaulters intended to

kill the victim at the time they were assaulting him.  Id.  Mr. Nelson responded

that a "big portion of the defense of this case is the fact that merely having weapons present doesn't mean that there's an intent to commit an aggravated assault that is more a defense.  So the fact that there's just 'assault' in this jury instruction negates that possible defense." Id. at p. 51.  Mr. Nelson requested that the instruction be changed to read "assault with a dangerous weapon." Id.

The court returned to the language of count one in the indictment which alleged, "Mr. Cottier unlawfully killed [the victim] by assaulting him with a machete, stick, bat, or cinder block or aided and abetted in that offense." Id. at pp. 51-52.  The court stated the charge asserted Mr. Cottier either assaulted the victim with those weapons or aided and abetted in the assault of the victim using those methods. Id. at p. 52.

The court offered to amend the instruction to read that Mr. Cottier, at the time the offense was committed, "must have:  1.  Known that a crime was being committed or about to be committed.  2.  Knowingly acted in some way for the purpose of causing, encouraging, aiding and betting [sic] the commission of the crime." Id. at p. 53.  Mr. Nelson indicated that change was unhelpful. Id.  He argued that it would be confusing to the jury and they could determine "aiding" could just be "a more minor act." Id. at p. 55.

The court explained that the high burden the government had to show was that this was a "killing with malice aforethought . . . [and Mr. Cottier couldn't] be convicted of second degree murder by engaging in simple assault." Id.  Ultimately, the court rejected Mr. Nelson's suggested amendment. Id.

Mr. Nelson testified that his comments and argument made while settling instructions at the pretrial conference just before trial were advocacy, not a misunderstanding of the law of aiding and abetting.  Docket No. 44 at pp. 75-76, 107-08, 111.  Specifically, he felt the Eighth Circuit Pattern Jury Instructions were unfair and that he was advocating to get jury instructions that were the "best instruction possible" for Mr. Cottier.  Id. at pp. 75, 80.

Mr. Nelson specifically rejected the suggestion that—as he prepared for trial—he was under a misapprehension as to the law.  Id. at p. 80.  He testified he knew that aiding and abetting merely required the government to show that Mr. Cottier knew an assault was being committed or aided in its commission.  Id. at pp. 78-80.  But, as a matter of advocacy on behalf of Mr. Cottier, Mr. Nelson argued for stronger language in the instructions:  that the government would have to prove Mr. Cottier knew that an assault with weapons was taking place or that a killing was taking place.  Id.

Mr. Nelson explained that his theory of defense was going to present a "very fine line" at trial.  Id. at p. 81.  The defense would be that Mr. Cottier went to the scene "for the sole purpose to observe an assault, to watch an assault, but then he was brought into an assault essentially cornered by Ferris and was forced into a fight."  Id.  Counsel stated he was simply trying to obtain a statement of the law in the instructions that would be most favorable to Mr. Cottier's theory of defense.  Id. at pp. 81, 88.  Counsel testified he *did* know that "if a jury believed that [Mr. Cottier] went down there with the intent to commit this assault that he could be found guilty of second degree murder."

26

Id. at p. 81. Counsel's strategy was to show to the jury that Mr. Cottier intended to be merely present at the scene, which was insufficient to convict him. Id. at pp. 81-82.

Counsel admitted he did not have any specific legal authority in support of his proposed changes to the court's jury instructions, but added that the district court was not required to use the pattern jury instructions. Id. at p. 82. Again, counsel stated he was just trying to advocate for the best instruction possible for Mr. Cottier. Id. at pp. 81-82. Mr. Nelson testified he was not surprised at the statement of the law as formulated by the court in its jury instructions. Id. at p. 87.

Mr. Nelson thought that most of the government's witnesses at trial were not very credible. Id. at p. 58. If the jury were to believe Mr. Cottier's testimony that he went to the scene not intending to engage in any assault, that he was just there to watch it, and that he just got "sucked into the assault," Mr. Nelson believed there was a chance Mr. Cottier could be acquitted at trial. Id. Mr. Cottier had told Mr. Nelson he was surprised at the presence of weapons at the fight, he did not see Terry Goings and Steven Steele arm themselves. Id. at pp. 106-07. Mr. Nelson's strategy at trial was to use the evidence Mr. Cottier would testify to in order to negate the element of whether he acted wantonly or recklessly. Id. at p. 107. Mr. Nelson testified that throughout his multiple conversations with Mr. Cottier while representing him prior to trial, Mr. Nelson instructed Mr. Cottier that he could be convicted of

aiding and abetting second degree murder even if the jury believed he did not throw a cinder block at Ferris.  Id. at p. 60.

### 7.    Jury Trial

#### a.    Mr. Nelson's Opening Statement

In opening statements at Mr. Cottier's trial, Mr. Nelson told the jury the evidence would show that Mr. Cottier intended to simply go and watch Steven Steele, Terry Goings, and Jerome Warrior fight Aaron Little Bear.  Docket No. 42 at p. 77 (Ex. 19).  Mr. Nelson explained that Mr. Cottier's statement to the FBI that he was "all about the fight" meant that he was "all about *watching* the fight."  Id.  Mr. Nelson further predicted that the evidence would show that Ferris Brings Plenty punched Mr. Cottier in the face first and that Mr. Cottier simply responded in self-defense.  Id.  Mr. Nelson stated the fight between Mr. Cottier and Ferris ended after each threw a few punches.  Id.  When Steele and Goings knocked Ferris to the ground and were striking him with a rake handle and a machete, Mr. Nelson said the evidence would show that Mr. Cottier yelled to stop the fight.  Id.

#### b.    Terry Goings III

Terry Goings testified Mr. Cottier encouraged Goings and others to fight Aaron Little Bear.  CR Docket No. 470 at p. 57 (JT Vol. 2 at p. 104).  Goings testified Mr. Cottier threw a cinder block at Ferris' face, causing him to stumble.  Id. at pp. 68-70 (JT Vol. 2 at pp. 115-17).  Goings also testified that Mr. Cottier kicked Ferris in the face when he was on the ground.  Id. at pp. 70-71 (JT Vol. 2 at pp. 117-18).

### c.    Ronald Mousseaux, Jr.

A neighbor, Ronald Mousseaux, Jr., testified he heard a commotion outside his home on the night of July 11/12, 2015, and could see someone getting beaten up in the neighbor's yard.  Id. at p. 160 (JT Vol. 2 at p. 207). Mr. Mousseaux testified that he didn't recognize anyone in the yard, but he heard voices saying "Kelm."  Id. at p. 161 (JT Vol. 2 at p. 161).

### d.    Dr. Donald Habbe

A forensic pathologist, Dr. Donald Habbe, testified that the cause of Ferris Brings Plenty's death was blunt trauma injury to the head.  Id. at p. 169 (JT Vol. 2 at p. 169).  When Dr. Habbe examined Ferris' body, he found no gravel, cinders, soot, or pieces of cinder block in any of the wounds (the photograph of the brick at the murder scene had soot on it).  Id. at p. 192-93 (JT Vol. 2 at pp. 212-13).

### e.    FBI Special Agent Matthew Thatcher

FBI Special Agent Matthew Thatcher testified that he interviewed Mr. Cottier four times prior to Mr. Cottier's initial appearance in court in this case.  Docket No. 471 at pp. 20-21 (JT Vol. 3 at pp. 280-81).  Agent Thatcher's first and last interviews with Mr. Cottier from July 20, 2015, and December 22, 2015, were audio recorded and those recordings were played for the jury.  Id. at pp. 31, 34, 52, 56, (JT Vol. 3 at pp. 291, 294, 296, 306-07) (referencing trial Ex. Nos. 37 & 40).  The two intermediate interviews were summarized by Agent Thatcher.

### i.    First Interview

In Exhibit No. 37, the audio recording of the first interview, Mr. Cottier denied any knowledge of events leading up to Ferris Brings Plenty's death. He told Agent Thatcher he had heard Terry Goings III and Terry's younger brother had been arrested in connection with the death. He said he heard the assault was a gang fight between the Tre Tres and the Juggalos, two groups he told Agent Thatcher he had never been associated with. He stated he did not associate with any gangs. He asserted he was in Rapid City at the time the assault happened and that Agent Thatcher could verify his location via his cell phone. Agent Thatcher told Mr. Cottier that Ferris died on July 12 and asked him again where he was on that date. Mr. Cottier said the last time he had been on the Pine Ridge Reservation was July 4. He left the reservation on July 5 and returned to his customary home in Rapid City and had not returned to the reservation prior to July 12. He told Agent Thatcher he owned only one pair of shoes, a pair of size 9 blue And1 tennis shoes, and he offered to give Agent Thatcher those shoes for testing for blood or DNA or anything. He swore on his children's lives that he had nothing to do with Ferris Brings Plenty's death.

### ii.    Second Interview

Agent Thatcher's second interview of Mr. Cottier took place August 24, 2015. Id. at pp. 39-40 (JT Vol. 3 at pp. 299-300). On that occasion, Agent Thatcher testified that Mr. Cottier admitted to being at the scene of Ferris' beating, but said he remained in an adjacent yard. Id. at p. 39 (JT Vol.

3 at p. 299). He told Agent Thatcher that Terry Goings, Steven Steele, and Jerome Warrior went into the yard where Ferris was. Id. at p. 40 (Jt Vol. 3 at p. 300). Mr. Cottier told Agent Thatcher that he was merely an observer at the beating. Id. Mr. Cottier told Agent Thatcher he was aware a fight was going to take place, but that he was only there to watch the fight, not participate in it. Id. at p. 42 (JT Vol. 3 at p. 302).

Mr. Cottier told Agent Thatcher that Steele and Goings began to assault the tent that Ferris was in and that Ferris emerged from the tent with both sides of his face bloodied. Id. at p. 43 (JT Vol. 3 at p. 43). Agent Thatcher told the jury, however, that he examined the tent and there was no blood inside. Id. at pp. 43-44 (JT Vol. 3 at pp. 303-04). Mr. Cottier told Agent Thatcher that Ferris tried to run away, that he tripped and fell, and that Goings and Steele continued to strike him with the rake handle and the machete as he lay on the ground. Id. at p. 45 (JT Vol. 3 at p. 305). After the attackers fled, Mr. Cottier told Agent Thatcher he dragged Ferris' body up to the road to try to get Ferris some help. Id. at p. 49 (JT Vol. 3 at p. 309).

### iii.    Third Interview

When Agent Thatcher interviewed Mr. Cottier again on October 6, 2015, Mr. Cottier basically gave the same story as he had in August, but this time he admitted that he struck Ferris once in the face with his fist, but only after Ferris punched him first. Id. at pp. 48-49, 51 (JT Vol. 3 at pp. 308-09, 311). He also admitted he had lied in an attempt to make himself look better when

31

he previously told Agent Thatcher he had dragged Ferris' body to the front of the house near the road.  Id. at p. 49 (JT Vol. 3 at p. 309).

### iv.    Fourth and Final Interview

In Exhibit No. 40, the audio recording of Agent Thatcher's fourth interview, Mr. Cottier told Agent Thatcher he was all about the fight that night that Ferris was assaulted, but when Steven Steele pulled the club out it changed him.  He went to the scene because he planned to watch a one-on-one fight.  Mr. Cottier stated Ferris rushed out of the tent, covering his head and the other people present jumped back.

Mr. Cottier admitted that he hit Ferris once with his fist when Ferris came at him because he was not expecting Ferris to come at him and Ferris hit him first.  Ferris then tripped and fell and Mr. Cottier punched him a second time, hitting him in the shoulder.  Ferris got back up to his feet.  Mr. Cottier backed up.  Jerome tackled Ferris and then both men got back up to their feet.

Mr. Cottier told Agent Thatcher that Terry displayed his machete before they went to the scene where the assault occurred.  Mr. Cottier told Agent Thatcher that Terry always had his machete with him.  Mr. Cottier stated he had no idea where the rake handle came from.  Mr. Cottier claimed the first time he realized Terry and Steve had weapons was when Ferris exited the tent.

Terry hit Ferris in the neck with the rake handle and Ferris buckled to his knees.  Then Steven Steele subsequently hit Ferris on the back of his head with the machete.  Ferris tried to crawl away, but Steve grabbed him by his t-shirt and wouldn't let him get away.  Steve continued to hit Ferris nonstop in

the head with the machete.  Terry joined in, hitting Ferris with the rake handle.

Ferris was curled up on the ground in the fetal position.  Steve and Terry also

kicked Ferris with their feet while he was on the ground.  When Ferris was

almost dead Billy Bob Bluebird kicked him once in the right side of his face.

Ferris rolled over and Steve hit him again.  Mr. Cottier told Agent Thatcher he

was telling Terry and Steve to quit and Steve told him to shut up.  Other

spectators were yelling at Terry and Steve to stop.

Mr. Cottier told Agent Thatcher the following persons were present:  Billy

Bob Bluebird, Tyler Cottier, Devon Elk Boy, Steven Steele, Terry Goings III,

Albert Cottier, Calmer Cottier, and Jerome Warrior.  Mr. Cottier said Emily

Bluebird[5] witnessed the events from inside her house looking through the

window.  After the beating stopped, everyone fled the scene.

### v.     Cross-Examination

Agent Thatcher admitted on cross-examination that he had discovered no

physical evidence linking Mr. Cottier to the death of Ferris Brings Plenty.  See

CR Docket No. 471 at pp. 73-74 (JT Vol. 3 at pp. 333-34).  The government's

case against Mr. Cottier was, Agent Thatcher testified, based on statements of

persons.  Id. at p. 77 (JT Vol. 3 at p. 337).  Agent Thatcher also admitted that

those persons whose statements he relied on in charging Mr. Cottier had all

lied to Agent Thatcher at one time.  Id. at p. 89-90 (JT Vol. 3 at pp. 349-50).

Agent Thatcher explained that he did not collect any cinder blocks or bricks

from the murder scene because the information that Mr. Cottier threw a cinder

---

[5] Emily Bluebird died prior to trial so she did not testify.

block at Ferris was not disclosed to Agent Thatcher until much, much later—too late for Agent Thatcher to retrieve the item.  Id. at p. 90 (JT Vol. 3 at p. 350).

### f.    Hearsay Testimony of Steven Steele

Hearsay testimony of Steven Steele was introduced disavowing his factual basis statement which stated Mr. Cottier threw a cinder block.  CR Docket No. 471 at pp. 108-09 (JT Vol. 3 at pp. 368-69).  A recording of Steven Steele telling Mr. Nelson's private investigator that the factual basis he signed was "bullshit" was played for the jury.  Id. at p. 111 (JT Vol. 3 at p. 371).  On cross-examination the investigator, Ron Switzer, admitted that he had never directly questioned Mr. Steele about the part of his factual basis statement which said Mr. Cottier kicked Ferris in the face and head while he was down on the ground.  Id. at p. 114 (JT Vol. 3 at p. 374).

### g.    Mr. Cottier's Testimony

Mr. Cottier testified in his own defense.  CR Docket No. 472 at p. 40 (JT Vol. 4 at p. 200).  For very long stretches, Mr. Cottier testified in narrative fashion without any questions being asked by Mr. Nelson such that the court intervened and instructed counsel to use question-and-answer format, but much of Mr. Cottier's testimony came in through self-directed narrative any way.

He gave general background on the culture of fighting, crime, alcoholism, and drug abuse on the Pine Ridge Indian Reservation and the high rates of

34

unemployment.  He testified that Terry Goings and he did not get along with each other and belonged to rival gangs.

On the night of the murder, Mr. Cottier testified he was present at the scene, expecting only to watch a one-on-one fight, not to participate in it.  Id. at pp. 135, 145, 147, 149-50 (JT Vol. 4 at pp. 553, 563, 565, 567-68).  Mr. Cottier testified he did not see Terry Goings or Steven Steele in possession of a machete or a rake handle immediately before the fight.  Id. at p. 150 (JT Vol. 4 at p. 568).  Mr. Cottier testified that when he entered the yard, Ferris popped out of the tent and swung at Mr. Cottier and struck him in the head hard enough to cause Mr. Cottier to "feel a white flash on . . . [his] left side."  Id. at p. 157-58, 192 (JT Vol. 4 at pp. 575-76, 610).  Mr. Cottier then swung and struck Ferris.  Id. at p. 158 (JT Vol. 4 at p. 576).

Ferris pranced into Jerome Warrior, who grabbed Ferris by the waist and "flopped" him.  Id.  Mr. Cottier then approached and struck Ferris in the ribs or back with his fists.  Id.  Ferris regained his feet and stood "towering" over Mr. Cottier and Jerome, at which time he was felled by a swing of a rake handle wielded by Terry Goings.  Id. at pp. 158-59 (JT Vol. 4 at pp. 576-77).  Mr. Cottier testified Jerome threw a log at Ferris and Terry and Steve began striking Ferris repeatedly with their weapons.  Id.  Mr. Cottier testified that Terry and Steve just kept striking Ferris in the head while he lay on the ground until he didn't make any more sounds, at which point everyone present left the scene.  Id. at p. 161 (JT Vol. 4 at p. 579).

On cross-examination, Mr. Cottier admitted to lying repeatedly to Agent Thatcher.  Id. at pp. 170-74 (JT Vol. 4 at pp. 588-92).  He admitted that he is small, but that people "can't underestimate me just because I am small" and that he bragged about a situation where he was able to best a bigger man. Id. at pp. 176-77 (JT Vol. 4 at pp. 594-95).  When asked if it was a fair fight, Mr. Cottier answered "when [Ferris] backed into my brother, Jerome, I mean, he took him down and I threw a couple more punches at him.  You could say, yeah, it wasn't a fair fight."  Id. at pp. 177-78 (JT Vol. 4 at pp. 595-96). Mr. Cottier admitted that his trial testimony was the first time he had ever admitted to punching Ferris three times.  Id. at p. 178 (JT Vol. 4 at p. 598). Mr. Cottier admitted on cross that before he entered the yard where Ferris was, his companions were whooping it up and calling out challenges.  Id. at p. 185 (JT Vol. 4 at p. 603).  He heard a sound of a zipper before he entered the yard. Id.  Mr. Cottier admitted he saw Steve and Terry with a machete earlier in the evening before he entered the yard where Ferris was.  Id. at p. 187 (JT Vol. 4 at p. 605).

On redirect, Mr. Cottier testified that Ferris Brings Plenty was a very large person who "towered" over Mr. Cottier.  Id. at p. 192 (JT Vol. 4 at p. 610). He had a reputation as being one of  the main fighters in the Tre Tre gang and was tough.  Id.  When Ferris struck Mr. Cottier first, Mr. Cottier's heart started thumping because he wasn't expecting it.  Id.  When Ferris stood up after having been taken down by Jerome, Mr. Cottier testified he was huffing and

36

puffing and ready to fight.  Id. at p. 194 (JT Vol. 4 at p. 612).  He testified

Ferris was like "a raging bull."  Id.

### h. Verdict

The jury convicted Mr. Cottier of second degree murder and conspiracy

to commit assault.  CR Docket No. 389.  The jury found him not guilty of

solicitation to commit a crime of violence.  Id.

### 8. Sentencing

At sentencing, the court calculated Mr. Cottier's advisory USSG

sentencing range to be 262 to 327 months' imprisonment.  CR Docket No. 479

at p. 21.  That calculation was based on a total offense level of 38 and a

criminal history category of II.  Id.  The court granted Mr. Nelson's motion for a

downward departure on the basis that Mr. Cottier's criminal history category

overrepresented the seriousness of his criminal history.  Id. at p. 27.

Therefore, the court calculated Mr. Cottier's USSG sentencing range using a

total offense level of 38 and a criminal history category of I, which yielded a

range of 235 to 293 months' imprisonment.  Id. at p. 28.

The court actually sentenced Mr. Cottier to 210 months' imprisonment.

CR Docket No. 444.  The additional downward variance from 235 months to

210 months was based on sentencing disparity between Mr. Cottier, and

codefendants Mr. Goings and Mr. Steele, who were all equally responsible in

the court's eyes.[6]  CR Docket No. 479 at p. 61.

---

[6] Codefendant Steven Steele received a sentence of 210 months' imprisonment
as did codefendant Terry Goings III.  See United States v. Steele, 5:15-CR-
50101-01-JLV, Docket No. 213 (D.S.D. Aug. 15, 2016); United States v. Goings,

**B.    Direct Appeal**

Mr. Cottier appealed his sentence and conviction.  United States v. Cottier, 908 F.3d 1141 (8th Cir. 2018).  Mr. Nelson represented him in this appeal.  He raised five issues for the court's determination:  (1) whether the evidence was sufficient to sustain Mr. Cottier's second degree murder conviction, (2) whether the district court's second degree murder instruction (instruction number four) was correct, (3) whether the prosecution improperly vouched for witnesses' credibility, (4) whether the district court erred in admitting evidence of a sexual encounter, and (5) whether the district court erred in calculating his criminal history under the USSG.  Id. at 1144-45.

**1.    Sufficiency of the Evidence**

Regarding sufficiency of the evidence, the court recited the following facts viewed in the light most favorable to the verdict:

> On July 12, 2015, Cottier, Steven Steele, Terry Goings III, and Billy Bob Bluebird were in Bluebird's backyard in Pine Ridge, South Dakota.  Some of the men were gang members, belonging to the Juggalos, a division of the Bloods.  Aaron Little Bear and Fred Quiver, members of a competing gang, the Tre Tre Crips, were drinking in the adjacent Quiver backyard.  Little Bear argued with Cottier, and the two groups exchanged gang-related slurs.
>
> After the argument ended without a physical confrontation, Cottier and his group went to his grandmother Rose Cottier's ("Rose") house.  There they were joined by Cottier's brothers Jerome Warrior and Albert Cottier ("Albert").  Angry that he got "punked out" when Little Bear argued with him and called him and his groups names, Cottier suggested that the group go back to the Quiver residence to fight Little Bear.  As the men walked to the Quiver residence, they discussed weapons, Goings gave his machete to Steele, and Goings found what the members described as "a stick" or a "rake handle."  The group split into two to bum-rush the Quivers—Steele, Bluebird, and Warrior on one side of the residence and Cottier, Goings, and Albert on the other side.

38

When they arrived at the Quiver residence around 3:00 a.m., they did not encounter Little Bear.  Instead, Brings Plenty was sleeping in a tent in the backyard.  When Brings Plenty emerged from the tent and tried running away, [Goings testified that] Cottier threw a cinder block at his head, which struck him in the face and caused him to stumble.  Warrior tackled Brings Plenty to the ground.  A vicious group beating ensued.  Warrior and Cottier (and possibly Albert and Bluebird) kicked Brings Plenty several times while Goings hit him repeatedly with the stick and Steele struck him multiple times in the back of the head with the machete.  Unsurprisingly, Brings Plenty died from his numerous blunt force trauma injuries.

Id. at 1145.

The court acknowledged that only Goings testified that Mr. Cottier threw a cinder block at the victim.  Id. at n. 3.  Steele had previously pleaded guilty and his statement of factual basis for that plea included a statement that Mr. Cottier had thrown a cinder block at the victim.  Id.  However, Steele told a private investigator for Mr. Cottier that the factual basis statement was "bullshit" and that Mr. Cottier did not throw the block.  Id.

The investigator testified to this out-of-court conversation with Steele at the trial.  Id.  A cinder block was found at the scene near the victim's body, but the victim's wounds did not have any soot, cinders, or gravel in them.  Id.  Steele did not testify at trial because he invoked his Fifth Amendment right not to incriminate himself.[7]  CR Docket No. 478.

---

[7] Because Steven Steele's factual basis statement was given under oath, if he testified at trial and disavowed that statement, he would implicate himself in the crime of perjury either at the time of trial or at the time of his change of plea hearing.

The court recited the elements the jury was required to find in order to convict Mr. Cottier of second degree murder: (1) that Mr. Cottier unlawfully killed the victim or aided and abetted the killing, (2) that he acted with malice aforethought, and (3) that Mr. Cottier was an Indian and the offense took place in Indian country. Id. at 1146 (citing 18 U.S.C. §§ 1111 & 2, and United States v. Lame, 716 F.2d 515, 518 (8th Cir. 1983)). "Malice may be shown by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that [the factfinder] is warranted in inferring that the defendant was aware of a serious risk of death or serious bodily harm." Cottier, 908 F.3d at 1146 (citing United States v. French, 719 F.3d 1002, 1008 (8th Cir. 2013) (internal quotation omitted). "An aiding and abetting conviction requires the government to prove a defendant took an affirmative act to further the underlying criminal offense, with the intent of facilitating the offense." Cottier, 908 F.3d at 1146 (citing United States v. Borders, 829 F.3d 558, 565 (8th Cir. 2016) (internal quotation omitted).

Mr. Cottier argued that no reasonable jury could have believed Goings' testimony that Mr. Cottier threw a cinder block at the victim. Cottier, 908 F.3d at 1146. The court found Goings' testimony was not "internally inconsistent or implausible on its face." Id.

However, even setting aside Goings' testimony about the cinder block, the court found "ample evidence" to find Mr. Cottier had aided and abetted second degree murder. Id. It was undisputed that Mr. Cottier entered the Quiver backyard with the intent to fight, that he actively participated in the

40

group beating by repeatedly kicking the victim, and that the combined effects of the group beating resulted in the victim's death.  Id.  These actions, the court concluded, showed Mr. Cottier had acted with reckless and wanton disregard of human life.  Id.  The evidence, the court held, showed "a continuous group beating of such a nature that it was certain to—and did— lead to serious injury or death."  Id. at n.4.  The court held the evidence was sufficient to sustain Mr. Cottier's second degree murder conviction.  Id. at 1151.

### 2.    Second Degree Murder Instruction

Mr. Cottier asserted the district court had incorrectly instructed the jury in instruction number four, the same instruction discussed at length above at the pretrial conference.  Id. at 1147.  Mr. Cottier argued the instruction allowed the jury to convict him for second degree murder even if he intended only to assault the victim.  Id.  The court rejected this argument.  Id.

The court noted that instruction number four required the jury to find that Mr. Cottier acted "willfully with malice aforethought."  Id.  "Malice aforethought" was defined correctly in instruction number two as possessing "an intent, at the time of [the] killing, willfully to take the life of a human being, or an intent willfully to act in callous and wanton disregard of the consequences to human life."  Id.  Because instruction four was linked to instruction two, instruction four required the jury to find that Mr. Cottier, "as an aider and abetter, . . . had to have the same intent of at least 'callous and wanton disregard' as required if he were a principal of the underlying offense of

41

second degree murder." Id.  The court affirmed Mr. Cottier's conviction and sentence.  Id. at 1151.

Mr. Cottier filed a petition with the United States Supreme Court seeking a writ of certiorari.  The Court denied the petition on December 9, 2019. Cottier v. United States, 589 U.S. ___, 140 S. Ct. 354 (2019) (mem).

**C.     Mr. Cottier's § 2255 Motion**

The sole remaining claim in Mr. Cottier's § 2255 motion before this court is that his counsel, Mr. Nelson, rendered ineffective assistance of counsel in violation of Mr. Cottier's Sixth Amendment rights when he incorrectly advised Mr. Cottier on the law, and recommended that Mr. Cottier reject the government's July 25, 2016, plea offer discussed above.  See Docket No. 1 at pp. 6-8.  Specifically, Mr. Cottier alleges counsel advised him he could not be convicted of second degree murder or aiding and abetting second degree murder unless the government proved he threw a cinder block or another similar object at the victim shortly before his death.  Id. at pp. 7-8.

Mr. Cottier alleges that, had counsel properly advised him that he could have been convicted of aiding and abetting second degree murder even without proof he threw a cinder block, he would have accepted the government's July 25, 2016, plea offer.  Id. at p. 8.  Had he done so, Mr. Cottier alleges he would have received a lesser sentence.  Id.

## DISCUSSION

**A.     Standard Applicable to Ineffective Assistance Claims**

**1.      The Standard Generally**

The Sixth Amendment of the Constitution of the United States affords a criminal defendant with the right to assistance of counsel.  U.S. Const. amend. VI.  The Supreme Court "has recognized that 'the right to counsel is the right to the effective assistance of counsel.' "  Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)).  Strickland is the benchmark case for determining whether "counsel's assistance was so defective as to" violate a criminal defendant's Sixth Amendment rights and "require reversal of a conviction."  Id. at 687.

"When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.  The defendant must also show that counsel's unreasonable errors or deficiencies prejudiced the defense and affected the judgment.  Id. at 691-92.  The defendant must show "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695. In sum, a defendant must satisfy a two-prong test.  Id. at 687.

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id.

"There is a presumption that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." <u>Hall v. Luebbers</u>, 296 F.3d 685, 692 (8th Cir. 2002) (internal quotation omitted).  It is the petitioner's burden to overcome this presumption, and a "petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." <u>Id.</u> (citing <u>Wainwright v. Lockhart</u>, 80 F.3d 1226, 1233 (8th Cir. 1996)).  Courts may address deficient performance and prejudice in any order, and courts need not "address both components . . . if the defendant makes an insufficient showing on one." <u>Strickland</u>, 466 U.S. at 697.

Counsel's conduct must be judged by the standards for legal representation which existed at the time of the representation, not by standards promulgated after the representation.  <u>See</u> <u>Bobby v. Van Hook</u>, 558 U.S. 4, 7-9 (2009).  " 'American Bar Association standards and the like' are 'only guides' to what reasonableness [of counsel's conduct] means, not its definition." <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 688).  "[T]he reasonableness of counsel's challenged conduct [must be judged] on the facts of the particular case, viewed as of the time of counsel's conduct." <u>Strickland</u>, 466 U.S. at 690; <u>see also</u> <u>Rompilla v. Beard</u>, 545 U.S. 374, 381 (2005) (emphasizing that "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made."); <u>Bell v. Cone</u>, 535 U.S. 685, 698 (2002) (reiterating that "every effort [must] be made . . . to evaluate the conduct from counsel's perspective at the time.").

The Supreme Court distinguishes between those cases "in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing judge,' " and those that would have had a reasonable probability of changing the result. Porter v. McCollum, 558 U.S. 30, 41 (2009) (quoting Strickland, 466 U.S. at 700). In assessing the prejudice prong, courts should consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." Id. at 41 (internal quotation omitted, cleaned up). It is not necessary for the movant to show "that counsel's deficient conduct more likely than not altered the outcome" of his case, only that there is "a probability sufficient to undermine confidence in [that] outcome." Id. at 44 (internal quotation omitted). "Judicial scrutiny of counsel's performance must be highly deferential" with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

### 2. Ineffective Assistance Causing Rejection of Plea Offer

The Supreme Court addressed ineffective assistance claims in the context of a rejected plea offer in Lafler v. Cooper, 566 U.S. 156 (2012). In Lafler, Cooper was charged with assault with intent to murder after shooting a victim in her buttock, hip, and abdomen. Id. at 161. The prosecution made two plea offers in which the prosecution offered to recommend a sentence of between 51 to 85 months, but defendant's attorney advised Cooper to reject the offers because the attorney mistakenly believed the prosecution would be

unable to prove intent to murder since all of the shots hit the victim below the waist. Id.  Cooper availed himself of his right to a trial, was convicted, and was sentenced to the mandatory minimum sentence of 185 to 360 months' imprisonment. Id.

In habeas proceedings, Cooper alleged his trial counsel provided ineffective assistance by recommending the rejection of the plea offers. Id.  The Court noted that criminal defendants' Sixth Amendment right to effective assistance of counsel extends to the plea bargaining process. Id. at 162.  The Court held that where counsel's ineffective advice led the petitioner to reject a plea offer, petitioner must show that but for the ineffective advice, he would have accepted the plea offer, that there is a reasonable probability that the plea offer would have been presented to the court, that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the actual sentence received. Id. at 164.

The parties agreed that Cooper's counsel's advice about the plea offer fell below accepted standards and was ineffective, so the only issue was whether Cooper could show prejudice under Strickland. Id. at 163.  The state argued that, because the trial itself was fair, the sole purpose of the Sixth Amendment—to provide a fair trial—was satisfied and there could be no prejudice. Id. at 164.

The Court rejected that narrow view of the Sixth Amendment, holding that its purpose is to ensure effective assistance at critical stages of a criminal

46

proceeding, including pretrial stages, sentencing, and appeal. Id. at 165. "Even if the trial itself is free from constitutional flaw, the defendant who goes to trial instead of taking a more favorable plea may be prejudiced from either a conviction on more serious counts or the imposition of a more severe sentence." Id. at 166.

When a defendant was convicted at trial of the same charge that would have been admitted in a plea agreement, "the court may conduct an evidentiary hearing to determine whether the defendant has shown a reasonable probability that but for counsel's errors he would have accepted the plea." Id. at 171. If the defendant makes that showing, the court has discretion to impose a sentence under the terms of the plea agreement, to reaffirm the sentence the defendant received after trial, or "something in between." Id. Where the charge(s) the defendant was convicted of at trial are different from the charge(s) to which he could have pleaded guilty pursuant to the plea offer, the court can order the prosecution to reoffer the plea proposal. Id.

In Garcia v. United States, 679 F.3d 1013, 1015 (8th Cir. 2012), the Eighth Circuit affirmed a district court's denial of habeas relief without an evidentiary hearing under § 2255 for ineffective assistance under a rejected plea offer scenario. In that case, the defendant's lawyer admitted he miscalculated Garcia's criminal history category and, accordingly, misadvised him regarding the government's plea offers. Id. at 1014. Garcia was facing both a conspiracy count and a distribution count. Id.

Because the two proffered plea agreements required Garcia to admit he brought one pound of methamphetamine to Rapid City on two occasions, and Garcia adamantly denied that he ever brought drugs on any occasion to Rapid City (both in his testimony at trial and at sentencing), the court held that Garcia failed to show that he would have accepted the plea agreement but for counsel's ineffectiveness. Id. at 1014-15.

Garcia also argued counsel should have advised him of the option to enter an open plea and thereby receive credit for accepting responsibility under the USSG. Id. at 1015. But an open plea would have required Garcia to admit to conspiracy to distribute methamphetamine and two counts of distribution of methamphetamine in Rapid City; the latter charges Garcia adamantly denied. Id. (citing Chesney v. United States, 367 F.3d 1055, 1059-60 (8th Cir. 2004); Sanders v. United States, 341 F.3d 720, 722-23 (8th Cir. 2003)). The court held that, on this record, Garcia could not show that he would have accepted the government's plea offer but for counsel's ineffectiveness. Id.

In Mayfield v. United States, 955 F.3d 707, 711-712 (8th Cir. 2020), counsel did not investigate the Arizona drug conviction alleged in the government's § 851 notice in a drug prosecution.[8] Had counsel investigated, he would have discovered the Arizona offense for possession of drug paraphernalia was not a "felony drug offense" as defined under 21 U.S.C. § 802(44). Id. Counsel explained at sentencing that "there was no reason for

---

[8] In a federal drug prosecution, a defendant's sentence can be increased if he has a prior felony drug offense and the government notifies the defendant of its intent to seek increased punishment. 21 U.S.C. § 851.

[Mayfield] to enter into a plea agreement because he was looking at 20 years [because of the § 851 notice] no matter what." Id. at 711. The court held if counsel advised Mayfield not to accept the government's plea offer based on this mistaken understanding, then counsel's advice "was not professionally reasonable." Id.

The court remanded the matter to the district court to hold an evidentiary hearing because the record was not developed as to prejudice. Id. at 712. Although Mayfield made a *post hoc* assertion that he would have accepted the government's plea offer had counsel not provided ineffective assistance, the question whether he would in fact have done so is "a fact-dependent issue that requires consideration of factors that would have affected Mayfield's decisionmaking and any 'contemporaneous evidence to substantiate [the] defendant's expressed preferences.' " Id. at 713 (quoting Lee v. United States, 582 U.S. 357, 369 (2017)).

Satisfying Strickland's two-prong test "is never an easy task." Lee, 582 at 368. Courts should not vacate a conviction based solely on "*post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." Id. at 369.

## B. Application of the Law to Mr. Cottier's Claim

The evidence in this case is closely balanced. This case presents a tale of two cities. Did Mr. Nelson accurately advise Mr. Cottier about the law and facts yet Mr. Cottier chose to take his case to trial for his own reasons? Or, did

Mr. Nelson not accurately advise Mr. Cottier of the law causing Mr. Cottier to reject a plea offer based on a misunderstanding of what evidence was required for a conviction?  Each scenario is equally plausible.  The court starts with describing what the law of second degree murder and aiding and abetting in the Eighth Circuit was as of July 2016.

### 1.   Second Degree Murder

In order to prove the crime of second degree murder committed in Indian country, the existing Eighth Circuit case law as of July 2016, set forth the following elements:  (1) the unlawful taking of a human life with (2) malice aforethought.  United States v. Lame, 716 F.2d 515, 518 (8th Cir. 1983).  The government must also prove (3) that the defendant is an Indian and (4) that the killing took place in Indian country.  18 U.S.C. § 1153.  These latter two elements were undisputed at Mr. Cottier's trial and undisputed in this collateral attack.

Malice aforethought requires proof of "intent at the time of a killing willfully to take the life of a human being or an intent willfully to act in callous and wanton disregard of the consequence of human life."  United States v. Johnson, 879 F.2d 331, 334 (8th Cir. 1989) (quoting United States v. Black Elk, 579 F.2d 49, 51 (8th Cir. 1978) (quoting United States v. Cox, 509 F.2d 390, 392 (D.C. Cir. 1974))).  "Malice may be established by evidence of conduct which is 'reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serius bodily harm.' "  Id.

Malice does *not* require a showing of a subjective intent to kill.  United States v. Eder, 836 F.2d 1145, 1149 (8th Cir. 1988) (emphasis added). Instead, it is sufficient for the government to show "reckless and wanton" conduct which is "a gross deviation from a reasonable standard of care" such that a fact finder would be justified in "inferring that [defendant] was aware of a serious risk of death or serious bodily harm." Id. (quoting Cox, 509 F.2d at 392).  See also United States v. Bordeaux, 980 F.2d 534, 537 (8th Cir. 1992) (same).

Assault resulting in serious bodily injury is not a lesser included offense of second degree murder since there are different elements for each crime. United States v. Cavanaugh, 948 F.2d 405, 410-11 (8th Cir. 1991).

The jury's verdict of guilt on a charge of second degree murder was upheld in United States v. Black Elk, 579 F.2d 49, 50 (8th Cir. 1978).  The victim died as a result of a severe beating and one of the codefendants who participated in the beating testified that Black Elk had hit and kicked the victim also.  Id.  Even though the codefendant's testimony was subject to vigorous cross-examination because he had been drinking and he was an accomplice to the killing, the court held there was sufficient evidence to support the conviction.  Id. at 51.  The court rejected Black Elk's argument that there was insufficient evidence of malice aforethought.  Id.  The court held if the jury credited the codefendant's testimony, this was sufficient to support a finding of malice aforethought since a subjective intent to kill was not required. Id.

51

In the <u>Eder</u> case, the court found evidence that the defendant inflicted a head injury on his minor daughter and then fled with her, neglecting to obtain medical care for her wound, was sufficient to sustain a conviction for second degree murder. <u>Eder</u>, 836 F.2d at 1149. In the <u>Bordeaux</u> case, the court found evidence of malice in support of a second degree murder conviction was shown by the defendant's blood-stained clothing and knife, his signed confession, and his inculpatory statements to others after the killing. <u>Bordeaux</u>, 980 F.2d at 536-37.

### 2.    The Law of Aiding and Abetting in the Eighth Circuit

### a.    Pre-<u>Rosemond</u> Cases

The case of <u>United States v. Roan Eagle</u>, 867 F.2d 436 (8th Cir. 1989), involved facts very similar to those in Mr. Cottier's case. Angeline Roan Eagle and Georgianna Brave were charged with first degree murder for the killing of Roland Belt. <u>Id.</u> at 438. All three were American Indians and the crime took place in Indian country, so the case arose under 18 U.S.C. § 1153. <u>Id.</u> Brave pleaded guilty, but Roan Eagle went to trial and was convicted. <u>Id.</u> On appeal, Roan Eagle argued the district court had incorrectly instructed the jury as to aiding and abetting under 18 U.S.C. § 2. <u>Id.</u>

The evidence at trial was that a family social gathering occurred at which alcohol was drunk throughout the evening. <u>Id.</u> Brave got into an argument with Belt and began striking him and Roan Eagle joined in. <u>Id.</u> Brave left to retrieve a knife and began stabbing Belt. <u>Id.</u> When Brave dropped the knife

and left the room, Roan Eagle picked the knife up and began stabbing Belt herself.  Id. at 438-39.  Belt later died from the stab wounds.  Id. at 440.

At trial, the district court gave the following jury instruction:

> In order to be convicted of a crime on a theory of aiding and abetting, the aider and abettor must share the specific intent of the perpetrator.  That is, an aider and abettor must know the full extent of the perpetrator's criminal purpose and give aid with the intent or purpose of facilitating the perpetrator's commission of the crime.

> If the intent of the aider and abettor is different from that of the perpetrator, the aider and abettor's guilt is measured by the intent that actuated him.

Id. at 445 n.14.

Roan Eagle argued on appeal that aiding and abetting is itself a specific intent crime and the district court should have so instructed the jury.  Id. at 444.  The Eighth Circuit rejected Roan Eagle's argument and affirmed the district court's jury instruction as a correct statement of the law.  Id. at 445.

The court held that if one is guilty of aiding and abetting, it is tantamount to being guilty of the underlying offense.  Id.  "Aiding and abetting is not a separate crime but rather is linked to the underlying offense and shared the requisite intent of that offense."  Id.  If the defendant associated himself "with the venture, . . . participated in it as in something he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed," then he is guilty of aiding and abetting.  Id. at n.15.  The law requires a "knowing participation in the activity," not proof that the defendant "has the specific intent to aid and abet."  Id.

In <u>United States v. Santana</u>, the court held aiding and abetting requires proof that the "defendant (1) associated himself with the unlawful venture; (2) participated in it as something he wished to bring about; and (3) sought by his actions to make it succeed." 524 F.3d 851, 854 (8th Cir. 2008). In that case, the court held the government need not prove a defendant actually possessed a controlled substance in order to be found guilty of aiding and abetting the crime of possession of a controlled substance with intent to distribute. <u>Id.</u> The government need only prove the defendant "associated himself with the unlawful venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed." <u>Id.</u> at 855. In addition, there must be proof the defendant shared in the principal's criminal intent. <u>Id.</u>

In <u>United States v. Eagle Hawk</u>, the court held in order to convict the defendant of aiding and abetting second degree murder the government must prove (1) that second degree murder was committed by some person or persons; (2) that the defendant knew such crime was being committed or was going to be committed; (3) that before such crime was completed, the defendant acted in some way to aid the commission of such crime; and (4) that in so acting the defendant intended to aid the commission of such crime. 815 F.2d 1213, 1216 (8th Cir. 1987).

### b.   **Rosemond**

Mr. Nelson relied in part on his understanding of aiding and abetting law on the Supreme Court case of <u>Rosemond v. United States</u> and its language that

aiding and abetting requires an intent to advance the commission of the charged offense, not "some different or lesser offense." Rosemond, 572 U.S. at 76.

In Rosemond, the defendant was convicted of violating 18 U.S.C. § 924(c), which makes it a crime to use or carry a firearm in connection with a crime of violence or a drug trafficking crime. Id. at 68. At trial, the government pursued two separate theories: that Rosemond himself had used or carried a firearm during a crime of violence or drug trafficking crime, or that he had aided and abetted a § 924(c) violation by another person.[9] Id. The issue before the Court was whether, in order to prove aiding and abetting a violation of § 924(c), the government had to prove the defendant (1) "intentionally took some action to facilitate or encourage the use of the firearm" *or* (2) if intentionally taking action to facilitate or encourage the drug crime was sufficient to demonstrate guilt. Id. at 68-71 (emphasis added).

Aiding and abetting requires the government to prove two things: (1) action and (2) intent. Id. at 71. The defendant must take some action that "aids, abets, counsels, commands, induces or procures" the commission of a federal offense. Id. at 70. He must also intend the commission of that federal offense. Id. at 71.

---

[9] The government pursued alternative theories at trial because the testimony of witnesses varied about which of three men in a car was the one who possessed and shot a firearm during a drug-sale-gone-bad. Rosemond, 572 U.S. at 67-68.

As to the first element of aiding and abetting, the action component, the Rosemond Court held that the law at the time 18 U.S.C. § 2 was enacted provided that one aids and abets a crime when he provides assistance as to the commission of at least one element of the crime, regardless of the quantity of assistance supplied.  Id. at 72-73.  The Court held that tenet of criminal law continues to apply:  a defendant is guilty of aiding and abetting so long as the government proves he participated in at least one element of the principal offense.  Id. at 73.  Assisting in a crime comprehends "all assistance rendered by words, acts, encouragement, support, or presence," even if the assistance relates to only one element of the crime.  Id. (quoting Reves v. Ernst & Young, 507 U.S. 170, 178 (1993)).  So, for example, one is guilty of aiding and abetting tax evasion if one helps a taxpayer hide his assets, even if one had no role in the filing of a false tax return.  Id. (citing United States v. Johnson, 319 U.S. 503, 515 (1943)).

In Rosemond's case, the Court noted that § 924(c) requires two elements: (1) the use of the firearm and (2) the commission of either a drug trafficking crime or a crime of violence.  Id. at 74.  Rosemond admitted to assisting in the drug trafficking crime.  Id. at 71-72.  The Court held that it was therefore "inconsequential" that Rosemond's acts did not advance both elements of the crime; aiding and abetting law requires his assistance as to only one element.  Id. at 74-75.  "[A]n act relating to drugs, just as much as an act relating to guns, facilitates a § 924(c) violation."  Id. at 75.  Therefore, the Court held the evidence was sufficient to prove the first prong of aiding and abetting—that

56

Rosemond took some action that advanced at least one element of the crime described by § 924(c).  Id.

As to the second prong of proof for aiding and abetting, the Court noted there must be an intent to facilitate the offense's commission.  Id. at 76.  The "intent to advance some different or lesser offense is not, or at least not usually, sufficient:  Instead, the intent must go to the specific and entire crime charged."  Id.  In the words of Judge Learned Hand, it is insufficient for a defendant to "just 'in some sort associate himself with the venture,' but [he must] also 'participate in it as in something that he wishes to bring about' and 'seek by his action to make it succeed.' "  Id. (quoting Nye & Nissen v. United States, 336 U.S. 613, 619 (1949) (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938))).

The Court noted but did not express any opinion regarding a widely held exception to the general rule that one is guilty of aiding and abetting when the crime committed is the "natural and probable consequence" of the lesser crime the defendant did intend to commit.  Id. at 77 n.7 (citing 2 W. LaFave, Substantive Criminal Law, § 13.3(b), at 356 (2003)).  LaFave noted the "better view" was that that a defendant is not an accomplice to a crime merely because the crime committed was the natural and probable consequence of another offense intended by the defendant.  Id.  The Court held that it need not address this issue as it was not presented by the facts of Rosemond's case.  Id.

For purposes of Rosemond's appeal, the Court held a defendant aids and abets a violation of § 924(c) when he is an active participant in a drug

transaction and he knows in advance that one of his confederates will carry a gun.  Id. at 77-78.  The Court reversed because the district court's instructions did not require the jury to find Rosemond had advance knowledge of the presence of the firearm at the drug deal.  Id. at 81.

### c.  Eighth Circuit Cases Decided After Rosemond and Before September 2016

Prior to the end of September 2016, the Eighth Circuit had cited Rosemond in three cases.  In United States v. Dean, 810 F.3d 521, 530 (8th Cir. 2015)[10], a defendant convicted of aiding and abetting an armed robbery claimed he did not know his accomplice was armed and did not have the opportunity to walk away from the crime when he did learn about the gun.  The court rejected this argument on factual grounds, finding the defendant's argument on appeal did not match the evidence adduced at trial.  Id.

In United States v. Borders, 829 F.3d 558, 565 (8th Cir. 2016), a jury convicted defendant Kyle of aiding and abetting the possession of stolen goods and vehicles based solely on evidence that Kyle rented the storage unit in which the stolen property was found and that he had a key to the unit.  Id. The court held this evidence was insufficient and vacated Kyle's convictions for aiding and abetting, citing Rosemond.  Id.  The court explained that aiding and abetting requires proof a defendant took an affirmative step to further the crime and had the intent to facilitate that crime.  Id. (citing Rosemond, 572 U.S. at 71).  The Borders court quoted the Rosemond Court's statement that

---

[10] The Dean case was reversed on appeal to the Supreme Court on a sentencing issue.  Dean v. United States, 581 U.S. 62 (2017).

"[a]n intent to advance some different or lesser offense is not, or at least not usually, sufficient:  Instead, the intent must go to the specific and entire crime charged."  Id. (quoting Rosemond, 572 U.S. at 71).  The court also noted the government may use circumstantial evidence to meet these elements of proof. Id.

The Eighth Circuit decided United States v. McArthur, 836 F.3d 931 (8th Cir. 2016), on September 8, 2016.  The court amended and superseded the 2016 opinion by a subsequent opinion, United States v. McArthur, 850 F.3d 925 (8th Cir. 2017), issued February 23, 2017.  However, the portion of both opinions dealing with aiding and abetting law under Rosemond remained the same in both opinions.  Compare McArthur, 836 F.3d at 944-47, with McArthur, 850 F.3d at 940-42.  Because the aiding and abetting portion of the opinion remained the same, the court finds it is fair to impute knowledge of this case to Mr. Nelson when evaluating the government's July 2016 plea offer, which was not finally rejected until September 22, 2016.  See Docket No. 42 at p. 53 (Ex. No. 11)

The McArthur court held that the elements of aiding and abetting a violation of § 924(c) required the government to prove four elements:  (1) that a crime of violence or drug trafficking crime was committed; (2) that a gun was used during that predicate offense; (3) that the defendant facilitated either the firearm use or the predicate crime or both; and (4) that the defendant had advance knowledge that one of his confederates would use or carry a gun in relation to the commission of the predicate crime.  McArthur, 850 F.3d at 941.

Although McArthur alleged on appeal that the district court's jury instructions did not require the jury to find the fourth element (advance knowledge), the court rejected this argument, holding that the lower court's jury instructions were not plain error.  <u>Id.</u> at 942.

### 3.    Did Mr. Nelson and Mr. Cottier Understand Aiding and Abetting Law?

Most assuredly, Mr. Cottier did not understand aiding and abetting law at the time he was going through his criminal cases.  The letters he wrote to Mr. Nelson evidence this misunderstanding.  <u>See</u> Ex. Nos. 106 & 107. Mr. Cottier's emphasis on finding out what the "killing blow" was and professing his lack of intent to murder or assault Ferris as evidence of his innocence on the aiding and abetting charge are inconsistent with the above law.

However, Mr. Cottier's lack of understanding is not necessarily proof of counsel's lack of proper advisement on the law of aiding and abetting.  As Mr. Cottier testified to, he did not rely solely on his counsel's advice as to what the law provided.  Docket No. 44 at pp. 161-62.  He did his own legal research, aided by a "legal beagle on the inside" (i.e. a fellow detainee), so his misunderstanding could well have stemmed from sources other than Mr. Nelson.  <u>Id.</u>  In addition, even after being given all the pleadings in this § 2255 case and listening to Mr. Nelson's testimony and the questions posed by both counsel about aiding and abetting law at the evidentiary hearing in this matter, Mr. Cottier testified that he *still* didn't understand the law of aiding and abetting.  <u>Id.</u> at 165-66.  Little surprise there.  It is plausible that Mr. Cottier,

having no legal training, would struggle to understand the complex concept of aiding and abetting.

The court turns, then, to whether Mr. Nelson properly understood aiding and abetting law and whether he properly conveyed his knowledge to Mr. Cottier. Mr. Nelson testified that, after doing the above research, his "understanding is that a person aids and abets a crime when in addition to taking the requisite acts he intends to facilitate that offense—that offense's commission. And an intent—this is directly from my research from <u>Rosemond</u>, 'An intent to advance some different or lesser offense is not, or at least not usually, sufficient. Instead, intent must go to the specific and entire crime charged'—so here, to the full scope." <u>See</u> Ex. No. 44 at pp. 143-44. This statement is an accurate statement of the law. But Mr. Nelson went on to testify that if the jury believed Mr. Cottier did not go to the scene with the intent to facilitate the assault, he would not be guilty of aiding and abetting. <u>Id.</u> at p. 144. This second statement does not stand up to scrutiny.

The district court's instruction, which the Eighth Circuit upheld as an accurate statement of the law, provided as follows:

> Mr. Cottier may be found guilty of second degree murder by aiding and abetting even if he personally did not do every act constituting the offense of second degree murder. In order to have aided and abetted the offense of second degree murder, Mr. Cottier, before or at the time the offense was committed, must have:

> 1.    Known that the assault of another individual was being committed or going to be committed;

> 2.    Knowingly acted in some way for the purpose of

causing, encouraging or aiding the commission of the assault; and

3.    Acted willfully and with malice aforethought as those terms are referenced in element 2.

Merely being present at the scene of an event or merely associated with others does not prove that a person has become an aider and abettor.  A person who has no knowledge that a crime is being committed or is about to be committed, but who happens to act in a way which advances the offense does not thereby become an aider and abettor.

For you to find Mr. Cottier guilty of second degree murder by reason of aiding and abetting, the government must prove beyond a reasonable doubt that all the essential elements of second degree murder were committed by some person or persons and that Mr. Cottier aided and abetted the commission of that offense.  If the government fails to prove any essential element beyond a reasonable doubt, you must find Mr. Cottier not guilty of second degree murder by aiding and abetting.

CR Docket No. 372 at pp. 6-7.

As is evidenced by the above instruction and the previously-discussed case law, it was *not* necessary for the government to prove that Mr. Cottier went to the scene of Ferris Brings Plenty's killing with the intent to facilitate Ferris' assault.  What the government *did* have to prove is that Mr. Cottier went to the scene knowing that an assault was going to be committed.  This is true as Mr. Cottier himself repeatedly avowed that he went to the scene to watch an assault—one that he thought would take place between Terry Goings and Aaron Little Bear.

The government also had to prove Mr. Cottier acted in any way for the purpose of causing, encouraging, or aiding in the commission of the assault of,

as it turned out, Ferris Brings Plenty. There was evidence in the discovery provided to Mr. Nelson that he did.

There was testimony from Terry Goings and Steven Steele that established that Mr. Cottier verbally encouraged Goings to fight. Both of these witnesses established that Mr. Cottier kicked Ferris in the face and head when he was on the ground. Finally, Goings testified that Mr. Cottier threw a cinder block at Ferris' head, causing him to stumble. A neutral third party witness testified that during the beating of Ferris he heard people calling out "Kelm," an abbreviated version of Mr. Cottier's first name.[11] None of this trial testimony was a surprise. The testimony of Steele, Goings, and Mr. Cottier's own brother, Jerome Warrior, was known prior to the July 2016 plea offer as all three codefendants had signed nearly identical factual basis statements establishing three facts: (1) Mr. Cottier encouraged the others to fight, (2) Mr. Cottier landed the first blow with the cinder block, and (3) Mr. Cottier kicked the victim in the face and head when he was down.

Also, Mr. Cottier's own testimony was that Mr. Cottier punched Ferris Brings Plenty. His explanation for the first punch was self-defense: he testified that Ferris struck him first in the face and he only struck back. But after Ferris was on the ground, further blows were no longer self-defense. Instead, the blows Mr. Cottier landed on Ferris when he was on the ground, whether

---

[11] Mr. Cottier's first name, Calmer, is not pronounced like the word "calm" as in "calm yourself down." Rather, it's pronunciation rhymes with "helm" or "kĕl-mer."

with his fists (as he himself admitted to) or his feet (as Goings and Steele said), were aiding Goings and Steele in their assault of Ferris, not self-defense.

The court finds, then, that Mr. Nelson's articulation of the law—that Mr. Cottier was innocent if the jury believed he did not go to the scene with the intent to assault Aaron or Ferris or anyone else—was in error.  The government could have convicted Mr. Cottier with evidence of his verbal encouragement before the fight and/or with his participation in the beating once the fight was underway.  In fact, Mr. Cottier may have landed the first blow on Ferris, whether through his fists or a cinder block.

There is evidence of Mr. Nelson's misunderstanding of the law throughout the record, notably at the pre-trial conference.  See CR Docket No. 474 pp. 47-56.  In discussing instruction number 4—aiding and abetting second degree murder—Mr. Nelson thought the jury would be confused by the use of the word "assault" as it "is a very low standard." Id. at p. 49. Mr. Nelson suggested adding "assault with a deadly weapon" as a required element.  Id.  The court then asked if Mr. Nelson understood the government's burden to prove the charge.  Id.  Mr. Nelson responded,

> They have to prove that there was an assault with a dangerous weapon, or something, to the point that it was elevated to an aggravated assault with malice aforethought.  They don't have to prove he was killed, but they have to prove that there was an intent to cause grievous bodily harm where somebody may die.

Id. at p. 50.

The court then explained to Mr. Nelson the elements of aiding and abetting second degree murder.  Id.  Mr. Nelson replied that "a big portion of

the defense of this case is the fact that merely having weapons present doesn't mean that there's an intent to commit an aggravated assault.  So the fact that there's just 'assault' in this jury instruction negates that possible defense." Id. at p. 51.  Mr. Nelson went on to ask the court to clarify if all three elements had to be satisfied to find Mr. Cottier guilty of aiding and abetting.  Id. at 55. After the court's explanation, Mr. Nelson remained adamant that the jury would be confused by the wording and that "willful malice and aforethought or an assault with weapons" should be added to the instruction.  Id.  He was concerned that the jury could find that just "a more minor act" could constitute aiding.  Id.  The court again explained that the government had the high burden of proving that there was a killing with malice aforethought and that Mr. Cottier could not be convicted of second degree murder by engaging in a simple assault.  Id.

This court is not convinced that Mr. Nelson was merely advocating for his client when requesting a more favorable instruction.  Mr. Nelson's proposed changes to the instruction were not in accordance with the court's established elements of aiding and abetting second degree murder.  Mr. Nelson's ferver when arguing for modification of instruction number 4 can only be justified by his foundational misunderstanding of aiding and abetting.  Mr. Nelson projected his own confusion of the law on the possible confusion of the jury. The concern of jury confusion over the wording of instruction number 4 was not shared by the court.

Mr. Nelson was offered an opportunity to explain his understanding of aiding and abetting second degree murder at the evidentiary hearing. He failed to accurately state the law. If Mr. Nelson did not fully understand the law of aiding and abetting at the time of the evidentiary hearing in this matter, it stands to reason he did not fully understand it at the time he represented Mr. Cottier. Therefore, the court finds by a preponderance of the evidence that Mr. Nelson did not accurately explain the law to Mr. Cottier when presenting to him the government's July 2016 plea offer.

### 4.    Did Mr. Nelson Have a Duty to Affirmatively Recommend Acceptance of the Plea Agreement?

Mr. Cottier asserted the additional argument at the conclusion of the evidentiary hearing that Mr. Nelson had a duty to affirmatively recommend the July 2016 plea offer. The parties did not brief this issue because this was the first time the argument was raised. In order to provide a complete record, the court addresses the issue.

First, the court notes that Mr. Nelson did not recall what he counseled Mr. Cottier as to accepting or rejecting the plea offer. Mr. Cottier testified that Mr. Nelson advised him to reject the offer. There are several credibility problems with Mr. Cottier's testimony. He claims Mr. Nelson told him the government did not possess the actual cinder block and, without the brick, it could not introduce the photo of the brick from the crime scene. This is clearly wrong as a matter of evidence law and the court disbelieves that Mr. Nelson would have made this statement.

66

Also, Mr. Cottier testified that Mr. Nelson told him the government would not drop the statement about the cinder block from the factual basis statement because it was needed to prove an element of the offense of second degree murder. The court discredits this statement as well. Mr. Nelson testified he understood at the time he was considering the government's plea offer that the government did not have to prove Mr. Cottier threw a cinderblock. Furthermore, Mr. Nelson testified he advised Mr. Cottier of this several times.

But the fact remains that Mr. Cottier testified Mr. Nelson advised him to reject the July 2016 plea offer. Mr. Nelson has no memory of whether he advised Mr. Cottier to accept or reject the offer. And, the court has found that Mr. Nelson did not fully understand the law of aiding and abetting as applied to Mr. Cottier's case.

*If* the Sixth Amendment requires an effective counsel to make a specific recommendation to accept or reject a plea offer, and had Mr. Nelson understood the law of aiding and abetting accurately, he should have recommended to Mr. Cottier that he accept the July 2016 plea agreement. Although at trial Mr. Cottier had a strategy to undermine Terry Goings' testimony (the bad blood between Goings and Cottier), Mr. Cottier's own brother, Jerome Warrior, and Steven Steele had both signed plea agreements prior to July 2016 that were congruent with Terry Goings' factual basis statement in three crucial respects: (1) Mr. Cottier was the one who encouraged everyone to go to the scene and assault Aaron/Ferris; (2) Mr. Cottier landed the first blow on Ferris by throwing a cinder block that

hit Ferris in the face and caused him to stumble; and (3) Mr. Cottier kicked

Ferris in the face and head when he was down. Although Mr. Cottier had a

theory for why Terry would make up lies to implicate Mr. Cottier, there was no

such theory for discrediting Jerome and Steven's testimony. Jerome was

Mr. Cottier's brother. Steven and Mr. Cottier did not really know each other

and had no past dealings with each other. Hence, there was no reason for

Steven to lie. Although only Terry was cooperating with the government,

Mr. Nelson could not count on Jerome and Steven not being called to testify at

a trial.

In addition, the discovery would have included the statement by Ron

Mousseaux, Jr., a neutral third-party witness, that he heard people calling

"Kelm" while the beating was taking place. Finally, Mr. Cottier himself had

admitted in his fourth interview with Agent Thatcher that he had punched

Ferris in the ribs or back after he was on the ground.

There was no obvious obstacle to all of this evidence being admitted at

trial. And although counsel had a strategy for discrediting Goings' testimony,

this would not have neutralized the rest of the testimony.

Recalling Rosemond and the other cases discussed above, it was only

necessary for the government to prove that Mr. Cottier committed at least one

of the acts necessary for second degree murder and that he otherwise acted in

some way to encourage the assault with the intent being to encourage the

assault. Here, kicking a man in the face and head while he is down on the

ground while others beat him with a rake handle and a machete is certainly an

act done with wanton and reckless disregard for life sufficient to satisfy at least one element of the crime of second degree murder.  Mr. Cottier's verbal encouragement to assault Aaron/Ferris and his throwing of the cinder block satisfies the taking of any action to encourage or facilitate an assault with the intent being to encourage or facilitate the assault.

Given an accurate understanding of the law and a comprehensive view of the evidence in this case, *if* Mr. Nelson had a duty to affirmatively recommend whether to accept the plea offer (a legal matter the court does not decide herein), then Mr. Nelson should have recommended to Mr. Cottier that he accept the government's July 2016 plea offer.

### 5. Whether Mr. Cottier Would Have Accepted the Plea Offer Absent Counsel's Error?

Mr. Cottier testified at the evidentiary hearing that, had counsel properly advised him of the law of aiding and abetting, he would have accepted the government's July 2016 plea offer.  Docket No. 44 at pp. 164-65.  But the Supreme Court has cautioned not to rely on a defendant's *post hoc* assertions and instead rely on contemporaneous evidence of a defendant's state of mind. <u>Lee</u>, 582 at 369.

Both Mr. Cottier and Mr. Nelson were in accord that Mr. Cottier was initially willing to accept the government's July 2016 plea offer if the language of the factual basis statement could be massaged.  Both witnesses also agreed that Mr. Cottier later withdrew his consent to pursue plea negotiations on this proposed July offer.

69

The record is clear that, from the very beginning, Mr. Cottier was adamant that he was not guilty of second degree murder.  Mr. Nelson recounted numerous and detailed reasons Mr. Cottier articulated for his resistance to pleading guilty to this crime:  he was reasonably sure he would not get a worse sentence than his codefendants Goings and Steele even if he were convicted at trial, his lesser role in the offense equated in his mind to pleading guilty to a lesser offense, he already had one "body" on his criminal record and did not want a second, and by going to trial he would erase any suggestion later when he was imprisoned that he had cooperated with the government.  Docket No. 44 at pp. 100-01, 132-34.  Mr. Cottier's contemporaneous writings and Mr. Nelson's contemporaneous memos to the file support this court's finding of fact that Mr. Cottier was opposed to pleading guilty to second degree murder and the government refused to offer a plea to any other charge.  See Docket No. 42 at pp. 25, 53 (Ex. Nos. 5 & 11); Docket No. 43 at pp. 87, 89, 92-93 (Ex. Nos. 102, 104, 106, & 107).

Prior to being represented by Mr. Nelson, Mr. Cottier agreed to give his fourth and final interview with Agent Thatcher to "clear his name."  See CR Ex. No. 40.  He expressed his understanding that if only Agent Thatcher knew the truth about Mr. Cottier's involvement in Ferris' death, that Agent Thatcher would agree Mr. Cottier was perhaps guilty of assault, but certainly not guilty of second degree murder.  Id.  This theme was persistent throughout the contemporaneous records created while Mr. Nelson was representing Mr. Cottier.

70

Would Mr. Cottier's attitude and decision have been different if counsel had accurately explained the law of aiding and abetting to him? There is no contemporaneous evidence of Mr. Cottier's state of mind as to this precise issue because, as the court found above, Mr. Nelson did not accurately explain the law while the July 2016 plea offer was under consideration. The court notes that Mr. Cottier heard the district court's accurate instruction on aiding and abetting at the jury trial and yet continued to assert his innocence as to murder at sentencing and on appeal. This weighs in favor of finding that he would not have accepted the government's plea offer of July 2016 even if he had known the law. On the other hand, contemporaneous evidence shows that Mr. Cottier *did* conditionally accept the plea offer for a period of some six weeks between August 18 and September 29, 2016. This evidence weighs in favor of finding Mr. Cottier would have accepted the plea offer had be been properly advised.

Mr. Cottier testified at the evidentiary hearing that he would have accepted the government's offer if he had known the state of aiding and abetting law. He also testified that he ultimately rejected the July 2016 plea offer because Mr. Nelson advised him he had a 65% chance of being acquitted at trial. It was possible that Mr. Nelson's misunderstanding of the law lead Mr. Cottier to believe he had a significant chance to be acquitted. By the slimmest of margins, the court concludes that Mr. Cottier has shown by a preponderance of the evidence that he would have accepted the July 2016 plea offer had he been properly advised on the law.

The evidence at trial was not equivocal, and hence, the reason the government refused to offer a plea to a lesser charge. Mr. Cottier verbally encouraged the others to assault Aaron/Ferris. He physically went to the scene of the crime knowing an assault was going to occur. By his own testimony, he struck the first blow with his fist and hit Ferris a second and a third time when he was down on the ground. The three other codefendants who participated in the assault on Ferris—Jerome, Terry and Steven—all pleaded guilty before July 2016 and all signed sworn factual basis statements that Mr. Cottier had encouraged others to fight, that he was present and threw a cinder block, and that he kicked Ferris in the face and head when he was on the ground. A third-party testified he heard an abbreviated version of Mr. Cottier's name called during the assault.

The court distinguishes this case from <u>Garcia</u>, discussed above. In <u>Garcia</u>, counsel's mistake of law related to the potential sentence Garcia might receive, not the elements of the crime. <u>Garcia</u>, 679 F.3d at 1014-15. The defendant was adamant he had not committed the crime of bringing a pound of methamphetamine to Rapid City. <u>Id.</u> Counsel's misadvice, then, had nothing to do with the elements of the crime. <u>Id.</u> In order to sustain Garcia's § 2255 motion, the court would have to have concluded that Garcia was willing to commit perjury if only his lawyer had properly projected his sentence. <u>Id.</u> This is a conclusion that is nonsensical and at odds with the law and facts of Garcia's case.

But here, the client's erroneous insistence on his legal innocence was buttressed by his lawyer's erroneous advice about what legal elements the government would have to prove in order to obtain a conviction.  Unlike <u>Garcia</u>, the lawyer's error goes directly to the issue at hand: whether the client would have admitted his guilt under the law.  As Mr. Nelson candidly admitted contemporaneously at the pretrial conference, if the court instructed the jury (correctly) as it was proposing, Mr. Cottier had no defense.  That is exactly the point.  And had this point been brought home to Mr. Cottier while he was considering the July 2016 plea offer, this court concludes that he would have accepted the offer.

Had counsel arrayed this evidence before Mr. Cottier, and had counsel accurately advised Mr. Cottier of the law of aiding and abetting, the court finds by a preponderance of the evidence that Mr. Cottier would have accepted the government's July 2016 plea offer.

### 5.    Prejudice

The court finds that Mr. Cottier has established deficient performance by counsel and causation—i.e. that that deficient performance caused him to reject the government's July 2016 plea offer which he otherwise would have accepted had he been properly advised.  It remains, then, to examine the second prong of <u>Strickland</u>—prejudice.

Mr. Cottier's sentence ended up being equal to the sentences imposed initially on codefendants Steven Steele and Terry Goings III.  But that is not the sole inquiry into prejudice.

Mr. Cottier's final presentence investigation report (PSR) calculated his USSG range to be 262 to 327[12] months' imprisonment based on a total offense level of 38 and a criminal history category of II.  CR Docket No. 434 at p. 13, ¶ 51.  Mr. Cottier's base offense level under the USSG was calculated to be 38, with no aggravating or mitigating adjustments.  Id. at pp. 5-6, ¶¶ 15-23.

Had Mr. Cottier accepted the July 2016 plea offer, he would have received 3 points downward adjustment to his base offense level for acceptance of responsibility and another 2 points downward adjustment for being a minor participant—all of which he lost by going to trial.  Docket No. 42 at pp. 31-33, ¶¶ E, F & H (Ex. No. 7).  This would have placed him at a total offense level of 33 instead of 38.  See id. and CR Docket No. 434 at pp. 5-6, ¶¶ 15-23.  With a total offense level of 33 and a criminal history category of II, Mr. Cottier would have been subject to a USSG range of 151 to 188[13] months' imprisonment.  The sentence Mr. Cottier actually received was 210 months' imprisonment.  CR Docket No. 444 at p. 2.  Therefore, Mr. Cottier has shown prejudice because the plea agreement, had he accepted it, would have resulted in a sentence lower than the sentence he actually got.

There is one more wrinkle that the court addresses, but which does not affect the above conclusion.  At sentencing, the district court found that, after hearing the evidence at trial and in five other codefendants' sentencing

---

[12] This equates to 21 years and 10 months' imprisonment at the low end and 27 years 3 months at the high end.
[13] This equates to 12 years and 7 months up to 15 years and 8 months' imprisonment.

hearings, Mr. Cottier's culpability for the death of Ferris Brings Plenty was equal to the culpability of Steele and Goings.  CR Docket No. 479 at p. 61 (Sentencing Hrg. Trscrpt.).  While Mr. Cottier did not wield a rake handle or a machete, the court found that he landed the first blow on Ferris by throwing a brick or some other object, and that he participated in the fatal assault.  Id. Because Steele and Goings received sentences of 210 months, and because the court viewed the three defendants as equally responsible, the court varied downward and sentenced Mr. Cottier to 210 months.  Id.  The court points this out as it may impact the remedy, discussed below.

### 6.    Remedy

The Court in Lafler instructed that when if a defendant has shown a "reasonable probability that but for counsel's errors he would have accepted the plea," and the charge of conviction is the same charge the defendant would have pleaded guilty to, the court has discretion to impose a sentence under the terms of the plea agreement, to reaffirm the sentence the defendant received after trial, or "something in between."  Lafler, 566 U.S. at 171.  Where the charges the defendant was convicted of at trial are different from the charges to which he could have pleaded guilty pursuant to the plea offer, the court can order the prosecution to reoffer the plea proposal.  Id.

Here, if Mr. Cottier would have accepted the plea agreement, he would have been convicted solely of aiding and abetting second degree murder.  By going to trial, he was convicted of a second charge, conspiracy to commit assault, which he would have avoided had he pleaded guilty.  This second

conviction did not affect the length of his sentence because the 120-month sentence imposed by the district court for conspiracy to commit assault was ordered to run concurrently with the sentence for second degree murder.  CR Docket No. 444 at pp. 1-2.

Because of these facts, the district court which will review this recommendation may choose, if it agrees with the analysis under both prongs of Strickland, to either (1) resentence Mr. Cottier according to the plea agreement, affirm the first sentence, or something in between; or (2) if there is material prejudice to Mr. Cottier as a result of being convicted of the additional charge, the court can order the government to re-offer the plea proposal and proceed with sentencing thereafter.  Lafler, 566 U.S. at 171.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends granting habeas relief to Mr. Cottier on his final claim, claim six and recommends denying the government's motion to dismiss that claim.  (Docket No. 24).

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the

district court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>,

781 F.2d 665 (8th Cir. 1986).

     DATED June 6, 2023.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge